[Civ. No. 14665.   Second Dist., Div. One.   Jan. 30, 1946.]

LELA B. PLATT, Appellant, v. CITY OF LOS ANGELES et al., Respondents.

Paul Taylor and Kenneth W. Kearney for Appellant.

Ray L. Chesebro, City Attorney, and John J. Tully, Jr., Deputy City Attorney, for Respondents.

WHITE, J.—This is an appeal from a judgment of the Superior Court of Los Angeles County denying a writ of

mandate to compel the payment of a pension to appellant as the widow of Richard T. Platt, a member of the Police Department of respondent City of Los Angeles.

Section 183 of the charter of the city of Los Angeles authorizes the payment of a pension to the widow of a deceased member of the police department who dies prior to the time when he has served in such department the necessary number of years entitling him to service retirement (in this case twenty years) only in the event that such member shall die as the result of any injury received during the performance of his duty or through sickness caused by the discharge of such duty. This provision of the charter means that a causal relationship, mediate or immediate, must be shown between the duty performed by the decedent and the immediate cause of his death. (*Cordell* v. *City of Los Angeles*, 67 Cal.App.2d 257, 262 [154 P.2d 31].) The question here presented is, therefore, the correctness of the trial court's conclusion that the deceased police officer's suicide while of unsound mind was not the result of injuries received by him during the performance of his duty. The existence of such causal connection is necessarily a scientific question, upon which it is necessary to resort to the scientific knowledge of experts trained in such scientific subject. Expert testimony, therefore, becomes essential.

The deceased became a member of the police department in 1922 and so continued until his death by suicide in 1940. In her petition for a writ the widow set forth a series of injuries sustained by the deceased during his period of service, the most serious of these being an injury to his right leg on November 21, 1928, which necessitated extended hospitalization and two bone-grafting operations. Petitioner then alleged that the deceased, ''as a result of his injuries received as aforesaid, and despite the attempts to restore himself to normal health by surgical operations and treatment, became despondent and sick and diseased in mind and body and his mind and nervous system suffered to the extent that he became mentally unbalanced and while so mentally unbalanced and as a result thereof, he took his own life on the 29th of December, 1940.'' It is conceded that at the time Police Officer Platt took his own life he was of unsound mind, and the trial court found that while the deceased was mentally unbalanced at the time he took his own life and his suicide was the result of his mental condition, ''said mental condition was not the

result of nor was it caused by, any or all of the injuries received by the said Richard T. Platt while engaged in the discharge of his duties as a member of the Police Department."

Appellant's contentions are (1) "the evidence shows a causal connection between Officer Platt's injuries, his unsoundness of mind and resulting death; (2) the judgment is against the weight of authority and is based upon an erroneous and narrow interpretation of the City Charter; (3) there is no real conflict in the evidence sufficient to support the findings of the trial court."

The evidence adduced before the trial court included the testimony of a physician who attended the deceased, as well as numerous lay witnesses, friends, acquaintances and associates of the deceased, and hospital attendants, whose testimony was directed to the conduct, disposition and habits of the deceased both before and after his accident of November 21, 1928, and to the circumstances surrounding his change of personality over the years which culminated in his death. The evidence thus given was made the basis for a hypothetical question propounded to each of three expert witnesses, one of whom was produced by each of the parties and another selected and appointed by the court. The pertinent and material evidence can therefore best be epitomized by setting forth said hypothetical question, which reads as follows:

"A man twenty-six years of age, in 1922, took and passed the required civil service examinations—physical and mental, for employment as a police officer in the City of Los Angeles, and was so appointed in the month of April, 1922.

"A few weeks prior to this appointment he had been honorably discharged from the United States Marine Corps, at the conclusion of a first enlistment, the last year of which was served in China and the Philippines.

"On the 30th day of August, 1923, this man married for the first time. This marriage lasted but four months. His wife secured a divorce on the grounds of extreme cruelty, alleging in her complaint that her husband objected to her continued employment—that on numerous times he quarreled with her, became abusive, stated she was not properly caring for him; that within a month after the marriage, he cursed her, told her to go to hell, and roughly shoved her about the room; that shortly before the actual separation, he had quarreled with her, called her a God-damn floozie and struck her

with his clenched fist. He did not make any answer to these charges and the case went by default.

"Notwithstanding the divorce upon the grounds indicated, this man and woman, after their separation, continued to see each other upon an entirely friendly basis, and this friendship continued until about the year 1936-37.

"There is nothing of particular moment or note in the record of this man as a police officer until the year 1928 when he began riding as a regular motorcycle officer of the City of Los Angeles. In that year he had three accidents, all of which are noted and referred to in the resume of this man's medical record at the Receiving Hospital of Los Angeles. . . . You have seen and examined this record, Doctor, and I am going to ask you to assume that exhibit to be a resume of the medical record of our hypothetical man in this question.

"In the month of June, 1927, this man married for the second time. He lived with his wife until April, 1930. We have no information as to the circumstances leading up to their separation, but in the year 1937 he brought an action for divorce upon the grounds of her desertion. She permitted this action to go by default, and a final judgment of divorce was entered October 25, 1939.

"During the period of his police department service preceding November 21, 1928, when he had a severe injury to his right leg, the details of which are shown in the resume of the medical records of the Receiving Hospital, hereinbefore referred to, we have the following picture of our hypothetical man:

"He was of a cheerful, happy-go-lucky disposition, and aside from the circumstances leading up to the separation and divorce in his first marriage, there is nothing recorded as to any unusual conduct or behavior on his part. He is described by his first wife's brother, whose relations with our hypothetical man continued on an entirely friendly basis after the divorce dissolving the first marriage, as being a 'man's man'; it was a pleasure to associate with him. To those who worked with him he appeared to be an average normal man, neither better nor worse than his fellows.

"Prior to the injury of November 21, 1928, our hypothetical man drank moderately—a cocktail or two before a meal—a few drinks in the course of an evening. Beginning in April of 1927 our hypothetical man was closely associated with another police officer in their daily work and also through

visiting between the two families. In the case of our hypo-thetical man, this would be the second wife, whom he mar-ried in 1927, as hereinbefore indicated. This officer stated that during this period our hypothetical man drank to a moderate degree; that upon occasion, they had perhaps more than an entirely moderate amount—such as the occasion of a party or some special function which in their opinion was the cause for celebration, but that on the whole, he never saw our hypothetical man drunk except upon the last occa-sion in which he and his wife visited our subject at his home. This was in the year 1928, some time before the acci-dent of November 21st, but subsequent to the time when he began riding on the motorcycle squad, which began in the summer of 1928. Apropos of this, the officer whose observa-tions we are now recording, states that our hypothetical man drank somewhat more after he became a member of the motorcycle squad. The occasion of the last visit of the one family to the home of the other was an invitation to dinner. Upon arriving at the home of our hypothetical man some time in the early part of the afternoon, he (the invitee) and his wife discovered our man and his wife in an intoxicated con-dition; the dishes were stacked in the kitchen sink and it was quite apparent from the condition of the home and the condi-tion of its occupants that there had been a party the night before and that the drinking had been continued to the fol-lowing day.

"On June 16, 1928, while riding his motorcycle in the dis-charge of his duty, our hypothetical man was injured to the extent shown in the medical resume. . . . September 29th he had another accident on his motorcycle. On the 21st day of November, 1928, and again while riding his motorcycle in the discharge of his duty, he had a more serious injury in which his right leg was broken.

"Following this last accident, as you will have noted from the record, our subject was confined in the Fire and Police Ward of the Receiving Hospital until January 17, 1929. From January to May he reported almost daily to the hospital for treatment. In July, 1929, a satisfactory union of the fracture not having been secured, a bone graft operation was per-formed. By November of 1929 the patient was, in the opinion of the police surgeon, able to return to light duty, it appear-ing that a solid union had been effected. He returned to such duty in the Police Department, but by March 10, 1930, he

was on crutches again, complaining of pain in the region of the old fracture, and X-rays indicated that there was a complete fracture across the old callous, including the bone-graft splint. March 14, 1930, the patient returned to bed in the Fire and Police Ward, and treatment by stimulating the site of the fracture was administered, as shown in the resume of the medical record. April 15th a walking cast was applied and the patient became ambulatory. In May of 1930 a walking brace was applied. By July it was apparent that a satisfactory union had not yet been accomplished, however, and after consultation with specialists, a second bone-graft operation was determined upon. This was performed August 15, 1930, following which the patient remained in the Fire and Police Ward until February 2, 1931, when he was discharged wearing a walking brace. X-rays taken in May of 1931 indicated a satisfactory union, the brace was removed and our hypothetical man returned to light duty in the Police Department as of May 26, 1931.

"To the doctors who treated and cared for our subject in the hospital and during the periods in which he reported there for treatment when he was ambulatory, he appeared to be in good spirits and to have made a satisfactory mental adjustment to his altered condition. He made no undue or unusual complaint of pain or suffering to the doctors. He was cooperative and accepted his confinement and handicap with good grace.

"As observed by the nurse who treated and cared for him during the period of his hospitalization and the period between the first setting of the fracture and the second bone graft operation, he displayed only slight concern over his injury and the seriousness thereof. One of the nurses administering to him observed that he was drinking to some extent throughout this period. This nurse admonished him to leave liquor alone until his leg was firmly set.

"Some time during this period and while wearing his walking brace, our subject stopped by to visit the officer with whom he had worked in 1927 and up to the time of the beginning of the motorcycle work in 1928. On the occasion of this visit our subject man was intoxicated and proceeded to demonstrate to his friend that his leg was movable. He removed the brace, and, taking his leg in his two hands, proceeded to bend it at the fracture line. While doing this, our

subject said it did not hurt, when the witness suggested replacing the brace.

"His first wife, who divorced him in 1924, as hereinbefore recounted, visited our hypothetical man while he was in the hospital and saw him upon frequent occasions while he was out of the hospital but undergoing treatment for the leg injury throughout the period of 1928-1931. She first noticed a change in his temperament during the brief period in the early part of 1930 when he was on light duty following his recovery after the first bone graft operation. He was assigned to the handling of telephone calls for the motorcycle squad, at headquarters. He complained to her of the telephones bothering him; that he would hear them ringing even when he was asleep—'I can hear them all night long.' During the period of his stay in the hospital following the second bone graft operation, which would be the latter part of 1930, she noticed other changes; 'He imagined that one or two of the nurses had it in for him.' He was afraid that people were 'ganging up' on him to cut off his leg. He depended upon the assistant police surgeon to protect him. During this stay in the hospital, a ring belonging to one of the other patients in the ward disappeared. He imagined the other patients believed him to be guilty of stealing it.

"The second bone graft operation which was performed August 15, 1930, presented no unusual or extraordinary circumstances so far as the medical details are concerned. The nature of the operation performed is set forth in the resume, which you have seen. The patient was up in a wheel chair on the 3rd post-operative day and thereafter. He was not finally released from the hospital until February 2, 1931, but from the middle of September on, he was not confined to bed in the hospital, being up and about in a wheel chair or on crutches.

"Upon his release from the hospital in February, 1931, he was aided and assisted by his first wife and her brother in settling in an apartment. His second wife had left him in the year 1930 some time prior to the second bone graft operation. His first wife recalls one occasion about this time when the wind unexpectedly blew a door shut. Our hypothetical man began to cry, and ran into the bathroom because, as this witness describes it, 'He was so ashamed of himself.'

"Upon the release of our hypothetical man from the Re-

ceiving Hospital in February, 1931, there was a firm union of the fractured leg, but there was a permanent disability in that member. It was slightly shorter than the other, and thereafter our hypothetical man was unable to walk or stand upon it for any extended period of time. He walked with a brace until May of 1931, and was not released to light duty in the Police Department until the latter part of that month. He was then assigned to the intersection of Los Feliz and Riverside Drive, acting in the capacity of traffic control officer assisting equestrians across Los Feliz Boulevard to and from the bridle path in Griffith Park. He continued to be so employed until the early part of January, 1937. On April 4, 1933, in stepping from the curbing at Los Feliz and Riverside Drive, he suffered a ruptured joint and adhesions of the right ankle. May 15, 1933, he 'phoned to the Receiving Hospital with a complaint of some aching and swelling in the right foot and ankle. On June 21, 1931, while on duty, he slipped and sprained his right ankle. April 21, 1936, at the intersection of Riverside Drive and Los Feliz, an automobile bumped into the rear of a car in which our hypothetical man was sitting and as a result of this accident he suffered strained muscles of his neck, with a contusion of the right leg two inches below the knee.

"During the first year or two in which our hypothetical man was stationed at Los Feliz and Riverside Drive, the first wife of this hypothetical man and her brother had occasion to pass that intersection frequently and saw and talked with him. The brother, during this period, noticed the first real change in him. He describes this change as 'loss of spirit'. His sister noticed this same depression in spirit, and further, that our hypothetical man would ask her if she had any aspirin, complaining of headaches. While to her he had complained some of headaches during the period of his installation in the apartment immediately following his release from the hospital in 1931, he had then refused her offer of aspirin, with the statement that they were 'dope' and habit-forming. In addition to the complaint of headache, our hypothetical man also complained to his former wife of pain in his fractured leg and of difficulty in getting in and out of his automobile to direct the traffic for the equestrians crossing the boulevard.

"In 1931 while on a trip to Las Vegas, Nevada, our hypothetical man met the woman who subsequently became his

third wife. Our hypothetical man and this woman began living together as man and wife in the month of January, 1935, in an apartment on Western Avenue in the City of Los Angeles, where they continued to reside until the latter part of 1936 or the first part of 1937, when, following a demand from the second wife for money and the threat on her part to report to the Police Department his conduct in living with a woman to whom he was not legally married our hypothetical man and the woman with whom he had been living and whom we shall hereinafter refer to as his widow, moved to another apartment house where he occupied a bachelor apartment in the same building in which she occupied a housekeeping apartment. In 1937 our hypothetical man instituted a proceeding for divorce from the second wife. A final judgment of divorce was not entered, however, until the fall of 1939 when our hypothetical man and the woman who became his widow moved to a house on Partridge Street. November 25, 1939, this couple were married. They continued to reside at Partridge Street until the death of our hypothetical man December 29, 1940.

"Prior to the time of their commencing to live together, the widow noticed no extraordinary or abnormal behavior on the part of her husband. He did, upon occasion, seem to have spells of depression but they were not of long duration, nor were they of extraordinary extent or degree. Following their taking up residence together, there were some periods of moodiness and displays of temper, but these she ascribed to minor difficulties incident to their new relationship.

"Throughout the period of their courtship and for some time following the commencement of their living together, the widow describes her husband as drinking to some extent. He was, as she described him, a 'two-fisted drinker'—he could drink along with any man. He did not during this period drink to the point of intoxication. The brother of his first wife visited our hypothetical man during the period of his residence in the apartment on Western Avenue, and, as he observed it, there had been a change in the drinking habits of our hypothetical man. Whereas, theretofore, as he had known him, our hypothetical man took a few drinks during the course of the evening, he now brought out the bottle, put it on the table, and drank more steadily; he would sometimes consume a pint of whiskey in the course of an evening's

visit. At this period our subject complained to the brother of feeling frustrated—he 'felt whipped.'

"Beginning in 1934, our hypothetical man come under the observation of the wife of one of his friends outside the Police Department. She and her husband, our hypothetical man and his wife, visited together frequently. They went on trips together. She describes our subject during the earlier years of her acquaintance with him as varying in health and spirits. He did upon occasion complain of his leg, particularly when walking or standing upon it for any length of time. As to spirits, our hypothetical man, as she observed him, was upon occasion moody; when not in this condition, he was of average temperament. In 1937 she recalls one occasion when, after walking about the county fair at Pomona for some time, our hypothetical man had to be assisted, almost carried, back to the automobile. The foot on the injured leg was black and blue and he seemed to be in considerable pain. As time went by, his spells of moodiness and depression increased. He would, as she describes it, sit for hours staring off into space. She last saw him December 23, 1940, by which time he had developed the peculiar idea that he was not as good a man as he had been before; that he was unable to walk and get about and do the things he had been accustomed to doing; he often spoke to her of his activities prior to his leg injury—his love for hunting and fishing in which sports he could no longer indulge.

"Another person who observed our hypothetical man over the period of his last five or six years of life was a woman who has known the widow for some considerable time. She first met him in 1934. She lived with our hypothetical man and his widow for about six to eight weeks in the month of December, 1937, and January, 1938. As described by her, our hypothetical man's mental condition was fairly good during this period of her acquaintance with him. Later she noticed and observed periods of moodiness, melancholy and depression. There were periods when he would flare up over nothing or become upset over personal business, the exact details of which she was not familiar with. During the period of the residence on Partridge Street (the fall of 1939 to 1940) our hypothetical man made complaint of bells ringing; he also complained of headache. Upon occasions she observed him sitting in his chair at home going through the motion of dialing a 'phone, picking up a receiver and putting

it to his ear and writing down messages, when, in fact, there was no 'phone near him.

"In the early part of the year 1937 our hypothetical man was transferred from the post at Los Feliz and Riverside Drive to the Central Police Station at First and Hill where he was assigned to the handling of telephone communications, reports, etc., for the motorcycle squad of the Police Department. The room in which this work was done was small, the ventilation was poor, and the lighting was artificial. At times his tour of duty or 'watch' was during the daytime, and at others at night from 8 a.m. to 4 p.m., or from 4 p.m. to 12 midnight. He was so assigned until September 16, 1940, when he was transferred to another station. His work there will be referred to later on in this question.

"During the period in which he was on the telephone at Central, he worked for a period with another police officer, a former motorcycle man, also on light duty because of injury. As observed by this man during the period in which they worked together, our hypothetical man at times complained of pain in his injured leg; he favored it; at times he limped noticeably. At times, without explanation, he would leave the desk at which he worked and walk out, returning shortly thereafter without making any explanation. There were times when our hypothetical man appeared moody, depressed and melancholy, and at times when the two of them were alone together there was no conversation— our hypothetical man would not have anything to say. At other times and in the presence of other officers—or if the two men started upon a subject of interest to our hypothetical man—he would converse readily and take an active part in the discussion.

"In the year 1938 and on this telephone assignment at Central our hypothetical man came under the observation of another officer who was over him in a supervisory capacity. This man had known our hypothetical man prior to 1926 and during that period had known him as an entirely normal and healthy individual. As observed in 1938, our subject appeared moody and depressed; he was not steady on the job; he appeared forgetful, sometimes looking off into space, and at other times he was attentive. Physically, he was incapacitated. He complainted of pain in his leg. He would sit rubbing the frontal portion of his head, complaining of headaches.

"In the summer of 1939 our hypothetical man was treated by a private physician following an attack of acute alcoholism. This doctor found our hypothetical man to be in poor condition. He had an unstable nervous system; he was dejected and despondent. He complained of headaches, backaches and pain in the right leg. This leg was shorter than the other, and bowed outward. His pelvic bone had lifted slightly to compensate for his shorter leg. He was underweight, had a poor appetite, and suffered from insomnia. This doctor prescribed vitamins, a balanced diet, exercise, and distraction from himself. This doctor further found a severe advanced neuritis, probably traumatic in origin, which, from the history of the case given to him by our hypothetical man, he attributed to the leg injury of 1928.

"Following this episode our subject did not indulge in the use of intoxicating liquors to any extent or at all until the summer of 1940. He and his wife had established their residence at the Partridge Street address in the fall of 1939. His periods of moodiness and depression increased. He complained to his wife of headache and a pain in his leg and back. He tried to work in his yard but declared that his aches and pains would not permit it. During the year 1940 our subject was unable to have any sexual relations with his wife. Sometime in the early part of this year he became impotent.

"From September 16, 1940, until the time of his death, he worked on the telephone and at the desk for an investigating unit of the Police Department, charged with the duty of investigating felony, traffic cases, accidents, etc. From October 16, 1940, on, to the date of his death, he came under the observation of a detective lieutenant of police who had known him casually some four or five years before. As observed by this man, our subject appeared to be often in a state of melancholy —he was morose, absent-minded and gloomy. There was some inability to concentrate on his duty. He stated, in answer to inquiries as to his health, that he was 'as well as could be expected.' Upon another occasion and shortly before his death, he stated that he sometimes felt as if he could not go on—he did not know whether he would make it or not.

"Beginning some time in the summer of 1940 our subject again began to drink. He would consume as much as a pint of whiskey in 24 hours. On six occasions, from the summer of 1940 until the date of his death, his wife states that he was intoxicated to the point where he lay down and went to

sleep. To her he stated that the drinking was to alleviate his pain and suffering.

"During the last six months of his life he at times spoke to his wife of his father owning and operating a very large ranch some place in Montana. This was not the fact. He spoke to her about a big political job he was going to get in Sacramento that would pay $12,000 a year. He spoke to her of the Mayor of the City of Los Angeles wanting 'to get' his job. During this period he would tell his wife and friends glowing accounts of his fighting with the Marines in France during the last war. The telling of these tales was not confined to the year 1940 but had begun some years prior thereto. While our subject had served in the Marines, he had not left the United States until the year 1921, when he served in China and the Philippines.

"There were a number of children living on the street and he was fond of them. He watched them at their play and was on the best of terms with them. They would play in and about his house. On occasion, however, he complained to his wife of their noise and it was necessary for her to send them away.

"On Christmas day, 1940, our subject and his wife went out for dinner at the home of friends. After the meal and in the late afternoon for no apparent reason he became nervous and demanded that she take him home. She did so and suggested calling a doctor for him. He declared he wanted no doctors near him.

"On the 28th day of December our subject was at home. He did not go to his work on that day. About 4:00 in the afternoon he came in, having been out for several hours, and his wife noticed that he had been drinking but was not intoxicated. She went across the street to a neighbor's house that evening, and sometime between 9 and 11 o'clock noticed that his automobile was gone—he had driven away. She did not return to her home that night but stayed at the neighbor's. She did not see him again until about 10:30 on the morning of December 29th.

"On the night of December 28-29, 1940, we know nothing of the movements or conduct of our hypothetical man until 3:00 a. m., of the morning of the 29th, at which time his automobile, which he was driving, collided with another automobile about five or six blocks away from his home. As a result of this accident our subject received a deep abrasion and

contusion, mid frontal, 1½ inches, as noted on the record by the doctor on the Receiving Hospital ambulance which went to the scene of the accident. Our subject was treated at the scene for this head injury and taken directly to his home. At the time of this accident our subject was intoxicated.

"At 10:30 in the morning our subject's wife, upon returning home, saw her husband coming from the bedroom. She asked him where he had been and what happened. He stated that he did not know—he could not remember where he had been or what he had done since leaving home the preceding evening. Inquiry on her part by telephone at his suggestion revealed that he had been in an automobile accident—that no other person was injured, and that his car was wrecked. He remained at home that day. In the afternoon the wife went out to look for a house into which they might move. His regular tour of duty that day would have been from 4:00 p. m. to midnight. When his wife returned to the house about 6:00 p. m. she found him in bed. He got up sometime later and she fixed him something to eat. He was intoxicated but promised to sober up. Sometime later and following a quarrel between them, she took some quilts and went outside the house. He ordered her back into the house. She told him that she could not stand his drinking and he continued abusing her. At about 11:00 p. m. she again went out of the house with her quilts. Shortly thereafter she heard a shot. The police were called and it was discovered that he had taken a 44-caliber, frontier-model revolver (a gun owned by his father), and, holding it in his right hand, had placed it to his right temple, and steadying the barrel with his left hand had pulled the trigger."

Dr. H. Victor Parkin, testifying for petitioner, expressed the belief that there was a causal connection between the injuries received by deceased in November, 1928, and his unsoundness of mind. In substance, he attributed his mental state primarily to a reaction to his crippled condition and the subsequent aggravations thereof, *"although there are some evidences of a manic-depressive state,* because he had an elated condition for a while. The consistent thing is the depressive state and it apparently grew out of his brooding over the fact that he was not the man he used to be by reason of his injury."

Dr. Eaton, on behalf of respondents, testified that he believed decedent suffered from manic depression; that he shot himself because of his mental illness and because of the

amount of alcohol he had consumed and the accident he had on the early morning of December 29, but that the accidents and injuries in his police work did not cause the mental illness which resulted in suicide; that any experience the man went through would have an effect on his whole life, his make-up and emotions; that one could not separate any man from his life experiences; they are all part of his life. In answer to the question, ''Are you able to separate the experiences he had as a motorcycle officer, suffering accident to his right leg, from his other experiences?'' the answer was, ''Those are all part of his life experiences as given in the history.'' In answer to the question, ''Well, a person who has the constitutional make-up that this hypothetical man had, would he be more likely to be affected by the injuries that this question shows he did have than if he had not had the injuries?'' he replied, ''I think a manic depressive make-up predisposes an individual to the development of manic depressive insanity; because of that constitutional make-up their resistance to any type of trauma I believe is less than in the normal individual who has not that make-up. To the question, ''. . . the man with the constitutional make-up that this man had, had a lower resistance to any type of trauma than if he had not had that make-up, that is correct, is it not'' he answered, ''I think so.''

Dr. A. V. Gerty, the psychiatrist appointed by the court, testified that in his opinion the patient was mentally unsound; that the injury and mental conditions were only incidental to and not the cause of the suicide; that the actual difficulty was the result of too much alcohol. He further testified on cross-examination as follows:

''A. I do not believe that I can change my opinion as to the amount of drinking, the amount of damage drinking did to his brain at the time of his death.

''Q. Well, the fact that he had not had a drink for a year, has that fact any effect on your opinion?

''A. I am sorry to say, but I cannot quite, even though the evidence may be that way, and put in the paper that way, I cannot quite subscribe to it myself.

''Q. Well, you do not believe that he went without a drink for a year, do you, Doctor?

''A. No, I don't.

''Q. That is all I wanted to know, that is what the evidence shows though.

"A. I just say that we do not get patients into this condition, through that way of drinking.

"Q. Well, what I am getting at is, Doctor, you do not believe that statement that he went a year without a drink?

"A. I cannot very well believe that, because of my experience with alcoholic patients."

It is conceded by appellant that the findings of the trial court, if supported by substantial evidence, may not be set aside, but it is urged that the testimony of Dr. Eaton and Dr. Gerty created no substantial conflict with the testimony of appellant's witness, Dr. Parkin, for the reason that Dr. Eaton based his testimony not only upon the hypothetical question but also upon the pension file, which was not before the court, and Dr. Gerty, in addition to the hypothetical question, considered the hospital and nurse's and doctor's records, and moreover, because of his prejudice against alcohol, did not believe the facts as stated in the hypothetical question.

Appellant's contention that Dr. Eaton's testimony was based in part upon certain pension files which were not before the court cannot be sustained, because the record shows that the doctor's reference to the pension files was in connection with an opinion he had rendered to the Department of Pensions and that in giving his testimony before the court he, as he said, "tried to make my answers here on the basis of the hypothetical question only" and the hospital records.

Appellant's attack upon the testimony of Dr. Gerty is equally devoid of merit, because while the witness stated that he was reluctant to believe that Officer Platt did not take any intoxicating liquor for one year during the period involved in the hypothetical question, nevertheless, in reading his testimony it is at once apparent that he based his conclusions as to the cause of Officer Platt's self-destruction upon the history and facts contained in the question as propounded.

The testimony of Drs. Eaton and Gerty was that the primary and efficient cause of Officer Platt's committing suicide was the excessive use of alcohol; that his mental derangement, as the result of which he took his own life, was occasioned by over-indulgence in alcoholic liquors. Dr. Gerty, in answer to a question, "And what connection if any did you find between that condition of mind and the injuries that he had suffered while in the discharge of his duties?" testified, "I think the injury and the mental condition was

only incidental to, in other words, it was not the actual cause of his suicidal attempt.'' In answer to the question, ''What do you consider the actual cause?'' the witness stated, ''I think the actual difficulty was the result of too much alcohol.'' Dr. Gerty traced Officer Platt's addiction through a period of years, showing the consumption thereof in increasing quantities, and that approximately four years after his discharge from the hospital Officer Platt ''would sometimes consume a pint of whiskey in the course of an evening's visit.'' With reference to the fact that the decedent drank more heavily after the accident than before, Dr. Gerty testified:

''Q. Now, maybe I have asked you this question before, do you attach any importance to the fact that he drank more heavily after the accident than he did before?

''A. I think it is progressive, I think the alcohol is one of those things we usually find is progressive, drink a little more and a little more, and it makes bigger inroads and first thing we know, he is in the situation that he was in 1940.''

The witness did not attribute any part of Officer Platt's drinking to the accident, and was of the opinion that the accident did not cause him to do the drinking he did. The doctor also gave it as his opinion that if Officer Platt had never had the accident in question, he would nevertheless, according to the facts contained in the hypothetical question, have committed suicide because of the alcoholic psychosis with which he was afflicted.

While it is true there was other expert and nonexpert testimony which would justify the inference and conclusion that there was a causal connection between the immediate cause of decedent's death and the accident he suffered in line of duty in the police department, the rule is so firmly established as to require no citation of authority that the findings of fact of a trial court will not be disturbed on appeal because of a conflict in the evidence. And this is true even though the appellate tribunal might feel that it would have found the facts differently were it the trier thereof. When it is required by law that proof of a fact or facts must be clear and convincing to support a given finding, the sufficiency of the evidence to support the questioned finding is primarily a question for the determination of the trial court. As was said by this court in *Cordell* v. *City of Los Angeles, supra,* at page 266, ''If there be substantial evidence to sup-

port such conclusion, the determination is not open to review on appeal. It being the function of the trial court to determine what facts are established by the evidence, before its conclusion can be set aside upon the ground of 'insufficiency of the evidence' there must be a clear showing that upon no hypothesis whatever is there sufficient substantial evidence to support the decision reached in the court below. We must also assume in favor of the judgment the existence of every fact which could reasonably have been deduced from the evidence. Only when we can conclude that such facts are insufficient to support the judgment rendered may we interfere, because, in such a situation the question becomes one of law.'' ■ By reason of the foregoing rules and the evidence herein narrated, it must be held that a reversal of the judgment in the instant case is not warranted upon the ground of insufficiency of the evidence to support the judgment rendered, because the court was fully warranted in accepting the opinions of the two psychiatrists who testified against appellant's contentions as the more reasonable.

Finally, appellant urges that the judgment is predicated upon a narrow interpretation of the applicable provisions of the city charter and is against the weight of authority which holds that pension provisions should be given a broad and liberal construction, to the end that the humane purposes of such enactments may be realized and fulfilled. We are not unmindful of the rule contended for by appellant, and we recognize that pension provisions in our law are founded upon sound public policy and with the object of protecting, in a proper case, the pensioner and his dependents against economic insecurity; and that such legislation should be interpreted fairly and broadly to the end that the intended benefits be conferred. But the right to a pension is not indefeasible, and where, as here, the finding of the trial court that decedent was mentally unbalanced at the time of his demise; that his suicide was the result of his unbalanced mental condition; ''but that said mental condition was not the result of, nor was it caused by, any or all of the injuries received by the said Richard T. Platt while engaged in the discharge of his duties as a member of the Police Department of the City of Los Angeles,'' finds substantial support in the evidence, it must be held on appeal that there was no causal connection between the injuries sustained by the decedent in line of duty as a police officer, his unsoundness of mind and resultant self-destruction.

The cases cited by appellant in support of her contention that the judgment is "against the weight of authority and is based upon an erroneous and narrow interpretation of the City Charter" are readily distinguishable from the case at bar. In *Faber* v. *Board of Pension Commissioners*, 56 Cal.App.2d 825 [133 P.2d 404], the deceased was struck on the head with a bottle, and his mental deterioration commenced almost immediately, while no facts were established and no medical theory was advanced in an attempt to attribute the mental derangement to a cause other than the head injury. In the case with which we are here concerned, while the self-inflicted fatal wound was the result of decedent's unsoundness of mind, there was substantial evidence that his mental derangement was not in turn caused by the injuries received in line of duty as a police officer.

In *Bradley* v. *City of Los Angeles*, 55 Cal.App.2d 592 [131 P.2d 391], the policeman was bitten by a mad dog. It was conceded that he had a preexisting liver condition. The trial court found, upon competent and substantial evidence, that the dog bite, followed by the Pasteur treatment for it, so accelerated and aggravated the preexisting disease that it ultimately and in direct sequence caused his death by suicide while of unsound mind.

The case of *Buckley* v. *Roche*, 214 Cal. 241 [4 P.2d 929], in the main merely announces the rule followed in the Bradley case, *supra*, with respect to the acceleration or aggravation of a preexisting condition. In the Buckley case, which was tried upon a stipulation of facts, the trial court held, and the Supreme Court affirmed the holding, that while the decedent was afflicted with a preexisting heart ailment, it was the exertion incident to his climbing a spiral stairway in the Hall of Justice where his service was performed that produced the fatal heart spasm, and that his death therefore was due to an injury sustained by him while in the performance of his duties.

In the case of *Casserly* v. *City of Oakland*, 215 Cal. 600 [12 P.2d 425], the court reaffirms the long recognized and established doctrine to which we have herein referred that pension legislation should be applied fairly and broadly with a view to conferring the benefits intended. But in the cited case the evidence clearly and without contradiction showed that the decedent, who was a member of the Oakland City Fire Department, contracted broncho-pneumonia as

the direct result of a fire drill participated in by him under orders of his superior officers on November 6, 1930, from the effects of which disease his death occurred on December 21 following. The sole question presented was whether a fireman who contracts a disease in the performance of his duty and whose death occurs shortly thereafter as a direct result thereof is "killed while in the performance of his duty" within the meaning of the charter of the city of Oakland.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 28, 1946.