[Civ. No. 15730.   Second Dist., Div. Three.   Nov. 4, 1947.]

MARIE LUNDRIGAN, Respondent, v. CITY OF LOS ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, John J. Tully, Jr., and O. M. Lloyd, Deputy City Attorneys, for Appellants.

Joseph Scott, J. Howard Ziemann and C. J. Scott for Respondent.

WOOD, J.—In this proceeding for a writ of mandate to compel payment of a pension to petitioner as the widow of a member of the Los Angeles Police Department, judgment was in favor of petitioner. Defendants appeal from the judgment on the ground that there was no evidence to sustain findings that there was a causal connection between the death of petitioner's husband and injuries received by him while performing his duties as a policeman.

■ Section 183 of the charter of the city of Los Angeles provides that a widow of a member of the police department is entitled to a pension if the husband died "as a result of any injury received during the performance of his duty, or from sickness caused by the discharge of such duty." Said provision requires that a causal relation, mediate or immediate, must be shown between the duty performed by the decedent and the immediate cause of death. (*Platt* v. *City of Los Angeles,* 72 Cal.App.2d 753, 754 [165 P.2d 714].)

Decedent was appointed a member of the police department on June 1, 1927, and continued to be a member of that department until the time of his death, February 24, 1945. During that period of time he received numerous injuries while performing his duties as a patrolman. He died at the age of 44, and the cause of death was carcinoma (a form of cancer) of the right kidney, with metastasis to the regional nodes and to the liver. Petitioner alleged that injuries received by decedent during the course of his employment in 1928, in 1934, and in 1941, were the direct and proximate cause of his death.

Petitioner testified that decedent was injured the first time in 1928 (when he was struck by an automobile), at which time he complained of pains across his back, right side and flank, and she does not remember how long he was off duty; that he was next injured in 1935, when he was struck by an automobile, at which time he complained of headaches and pains in his back and body where he had been hit; that the next injury occurred in November, 1943, when he was struck by an automobile, at which time he complained of pains over his left lung, his heart region, left shoulder and back and said

he ached all over; that at that time he was off duty about 24 days and in bed about two-thirds of the time; that from November, 1943, to November, 1944, he complained "a good deal of his back and kidneys and had vomiting spells"; that he entered a hospital November 20, 1944, where he was operated upon and where he remained until January 12, 1945; that he reentered the hospital February 5, 1945, where he died on February 24, 1945. (She further testified that she obtained a decree of separate maintenance August 11, 1942; that on August 22, 1942, decedent returned to their home and they lived together thereafter except for a period from the latter part of November, 1943, to Christmas Day of that year; that they were separated seven or eight months at the time the decree was granted but she saw him practically every week.)

A witness called on behalf of plaintiff testified that he had known decedent about 23 years; that they were very close friends and he visited decedent in his home about twice a month regularly; that decedent first complained to him of being in pain about 1935; that on several occasions during 1935, he complained to him about having pain in his back; that during 1936, he also complained about having a pain in his back, and on occasions he was lying on the couch with a heating pad on his back; that the next time decedent complained of pain to him was in 1939, when decedent said that his back hurt at times; that that was the last time he saw decedent; that decedent complained only about his back to the witness; that most of his visits to decedent were on Sundays, and he would say decedent was lying down 90 per cent of the times he visited him.

At the close of the testimony of these two witnesses the trial was continued until a later date, pursuant to a previous stipulation, to allow counsel for petitioner and defendants an opportunity to prepare a hypothetical question, which they would stipulate was a proper question, to be submitted to medical experts for study. One month later, and after the medical experts had had an opportunity to study the hypothetical question, the trial was resumed and two physicians were called as witnesses on behalf of petitioner and two on behalf of defendants. The hypothetical question was introduced as plaintiff's Exhibit 1 and it consisted of:

(1) A résumé of a medical record of the receiving hospital of the city of Los Angeles, which showed decedent's illnesses and injuries, diagnoses, treatment and time off duty from

November 18, 1927, to the time of his death, and which disclosed that among the injuries he had sustained while performing his duties as a policeman were the following:

January 9, 1928—*Statement:* Dragged by automobile. *Diagnosis:* Contusion with ecchymosis (black and blue marks), crest of ilium (top of hip bone), right, near anterior superior spine.

January 14, 1929—*Statement:* Condition followed strain of right hip 1/9/28, making an arrest. *Diagnosis:* Left inguinal hernia.

September 28, 1928—*Statement:* Scratched by a prisoner. *Diagnosis:* 5 or 6 abrasions right wrist, volar surface.

October 21, 1930—*Statement:* Hurt finger on auto fender. *Diagnosis:* Fracture, distal phalanx, left little finger.

June 10, 1931—*Statement:* Struck hand against auto fender. *Diagnosis:* Laceration left hand.

May 16, 1932—*Statement:* Struck by rear of auto. *Diagnosis:* Contusion, head of right fibula.

June 24, 1933—*Statement:* While directing traffic struck left hand on door of auto. *Diagnosis:* Contusion with swelling, dorsum of left hand.

August 20, 1934—*Statement:* Injured back of right hand and head while directing traffic. *Diagnosis:* Small hematoma, mid parietal. And contusion and abrasion dorsum right hand.

November 22, 1934—*Statement:* Left hand twisted and wrenched by steering wheel. *Diagnosis:* Sprain of left wrist.

April 15, 1935—*Statement:* Injured right hand pumping flat tire on police automobile. *Diagnosis:* One-half inch shelving laceration right hand web of thumb.

January 4, 1936—*Statement:* Handle of passing car door struck left elbow. *Diagnosis:* Contusion left arm near elbow, contusion ulnar nerve with paresthesis.

November 17, 1936—*Statement:* Strained back when reaching to get hold of person about to step in front of streetcar. *Diagnosis:* Lumbago.

December 28, 1936—*Statement:* Scratched hand on fender while marking tires.

November 5, 1937—*Statement:* Sprained back going upstairs at Central Station. *Diagnosis:* Sprain, left lumbar.

November 1, 1941—*Statement:* Injured while subduing prisoner. *Diagnosis:* Swelling, left anterior chest, left second and third ribs. Contusion right mandible. Possible fracture.

September 17, 1942—*Statement:* Punctured hand on nail

on desk. *Diagnosis:* Puncture wound, left hypothenar eminence.

(In addition to the above, the medical record shows approximately 42 entries to the effect that decedent, during the time he was an officer, had various illnesses, such as colds, influenza, pleurisy, pains in his chest and ribs, biliousness and nausea.)

(2) A letter, dated November 16, 1944, written by a doctor to the surgeon of the receiving hospital, which stated that decedent consulted him and complained of scattered muscular pains, particularly over the back and hips; that an examination disclosed a possible gastric pathology, and that decedent would remain under the care of the clinic for several weeks, but it would probably be all right for him to return to his regular work;

(3) A letter written at the request of petitioner by Dr. Brace, the clinical director of the veterans administration, to the Los Angeles police and pension board, which stated that the decedent was admitted to that "Facility" on July 19, 1937, for the treatment of tonsillitis, and that a tonsillectomy was performed; that he was again admitted to the hospital November 20, 1944; that he came by ambulance and stated that he had been in good health until three weeks prior to the admission when he had pains in his abdomen and back and was nauseated; that during a routine examination it was found that he had a mass in the right upper abdomen, which was consistent with a tumor of the kidney; that a nephrectomy (removal of kidney) was done which revealed a papillary carcinoma of the kidney; that his post-operative course was complicated by severe illness; that examination by the tumor board on December 15, 1944, revealed a palpable node in the left supraclavicular region and a recent scar in the right flank which was healing; that a diagnosis of carcinoma of the right kidney with metastasis, post-operative, was made, and X-ray therapy recommended; that when he recovered from the post-operative illness the X-ray therapy was carried out; that decedent became ambulant, afebrile and his only complaint was a pain in the left back; that he was discharged on January 9, 1945, with advice to report for a "followup" examination; and that the decedent was last admitted to the hospital on February 5, 1945;

(4) A letter written after the death of decedent, at the request of petitioner, by the clinical director of the veterans hospital to the department of pensions, which stated that decedent was discharged from the hospital on January 9, 1945,

where he had been operated upon for a right nephrectomy; that he was readmitted to that hospital on February 5, 1945, for treatment of carcinoma of the right kidney; that upon admission he complained of pain in the right flank, nausea and vomiting; that he was examined by the tumor board on February 9, 1945, which board made a diagnosis of carcinoma of the right kidney, post-operative, with metastasis to the regional nodes and to the liver; that medical palliation was recommended; that he did not respond to conservative therapy and became progressively worse until February 24, 1945, when he expired;

(5) An injury report dated January 16, 1929, made by decedent, which stated that after the injury on January 9, 1928, he was treated for hip bruises and at that time he complained of sharp pain in his left side, which the doctor said may have been the strain from holding on to the side of the automobile he "was dragged by," and the report also stated that that "pain left and then returned about 6 weeks or 2 months later, and has been bothering me ever since"; that several months ago he noticed a swelling in his side which proved to be a hernia, and he requested a leave of absence for an operation;

(6) A letter written by a captain in the personnel division of the police department to the chief of police, which stated that decedent's personal file disclosed the following record of injuries sustained by decedent "in line of duty":

"1-17-29: Herniotomy—Hit by car—1-9-28;
"8-21-34: Blood tumor forehead—Recurr. 1-9-28;
"11-5-37: Sprain left lower back—Slipped on steps;
"11-1-41: Contusion ribs, chest—Suspect resisting arrest;
"9-16-42: Puncture wound left hand—Moving typewriter";

(7) An injury report dated November 8, 1937, made by decedent, which stated that he slipped and fell while ascending stairs from the desk sergeant's office, and felt something snap in the lower left side of his back and had to brace himself with his hand to keep from doubling up; went home, massaged his back but obtained relief from the pain only about 30 minutes; that the following morning he reported to the receiving hospital and went there every day thereafter for light treatments and wore a surgical belt to relieve the pain in that area, which pain seemed to be getting worse instead of better; that the doctor recommended he remain off duty and immobile, if possible, which he would do as soon as convenient;

(8) An injury report dated November 3, 1941, made by the decedent, which stated that on October 31, 1941, a suspect had resisted arrest and a scuffle ensued in which decedent received several punches in the face and upper part of the chest; that about an hour afterward he had difficulty in breathing, and the left side of his chest hurt whenever he raised his left arm; that he was treated at the receiving hospital and reported for duty on November 1st and November 2d, but the pain became more acute and it was difficult for him to move, and on November 3d, the doctor at the receiving hospital ordered him off duty;

(9) A résumé of the records of the office of medical examiner regarding decedent, dated August 17, 1945, and addressed to the police department, which shows the results of five physical examinations given decedent from April, 1933, to August, 1943, stating his weight, height and his blood pressure, blood count, urinalysis and finding;

(10) The substance of the testimony of petitioner and her lay witness.

It was stipulated that the assumed facts embodied in the hypothetical question were the facts of the case, except as to the testimony of the two witnesses, regarding which it was stipulated merely that they did so testify.

Dr. Herbert A. Rosenkranz, called on behalf of petitioner, testified that he was admitted to practice in California in 1911; that he had practiced medicine since that time except for four years when he was taking postgraduate courses; that he specializes in urology, that is, any diseases of the genito-urinary system, kidneys, bladder, etc., including cancer; that he was one of the chief urologists for the general hospital in Los Angeles County for 27 years; that while he was on active duty at the general hospital he saw about 12 cases of cancer of the kidney a year; that he had read the hypothetical question, and he was of the opinion that decedent died of papillary carcinoma of the kidney, caused by one or more of the injuries he had received; that he based his opinion on the fact that decedent was rather severely injured three or four times and on the fact that decedent had considerable pain from time to time in the kidney region; that rather frequent pain in the back is a symptom of tumor of the kidney; that the kidney is comparatively easy to injure because the liver holds it rigidly in one place and it cannot yield to external pressure; and that it is an established scientific fact in the medical profession that cancer of the kidney may arise from a single

minor injury. He testified on cross-examination that the decedent had so many injuries that could have caused kidney trouble that it was impossible to confine his opinion to any one injury as having caused it; that he considered that the injury to the hip on January 9, 1928, contributed to or caused the kidney condition; that the severity of that injury was indicated by the fact that decedent had a hernia considered to have been acquired in the line of duty on January 9, 1928 (referring to medical report in letter by police captain, and to decedent's injury report on January 16, 1929, contained in the hypothetical question); that another medical report made by the receiving hospital on January 14, 1929, contained a diagnosis of left inguinal hernia with the statement that the condition followed strain of the right hip on January 9, 1928; that the injury on November 17, 1936, when decedent strained his back, was diagnosed as lumbago, but lumbago is a "cover-up" term for a lot of conditions and he (the witness) did not believe the condition was lumbago; that decedent complained of pain in the right scapular (shoulder blade) region and that is one of the "classical regions to which kidney pain is referred"; that he also based his opinion in part upon the chest injury which occurred on November 1, 1941, and that it is possible the chest injury caused the kidney condition; that he assumed there was a connection between the chest injury and the kidney condition; that anything which injures the chest might cause an injury to the kidney and a severe chest injury might rupture a kidney; that the decedent seemed to have suffered a fracture of the chest and that would indicate that the injury was rather severe. He also testified that it is a scientific fact that there is a cancer cell in the great majority of bodies; that some of these wake up and cause trouble at some stage in life, while others remain dormant; that an injury may activate a "slow" cancer and turn it into a "fast" one, and it may cause a dormant cancer cell to become an "acute malignant cancer"; that anyone without cancer cells can get cancer; that he would say the average person lives 5 or 10 years with cancer of the kidney and some last much longer; that it depends upon the variety of cancer, some progressing rapidly and some slowly; that a kidney tumor may last for 20 or 30 years, and the exact time of the injury would make no difference; and that cancer of the kidney is seldom diagnosed in its early stages unless there is bleeding, and many of them do not bleed.

Dr. Frank H. Chase, called on behalf of petitioner, testified that he was admitted to practice in California in 1915, and has practiced ever since; that he has been medical referee for the New York Life Insurance Company since 1925; that he has had no special training in cancer; that he has had the experience treating cancer that any physician would have over the period of 30 years; that he had seen many cases, had personally operated upon probably 12, and treated probably 24 more; that he did not think any of those cases were cancer of the kidney; that he had studied the hypothetical question; that in his opinion the cancer was the result of trauma received by decedent while he was a police officer; that in his opinion trauma causes most cancers, and irritation is a rather ordinary cause of cancer; that cancer cells are not stationary and can find their way to the kidney from other parts of the body; that cancer of the kidney could be caused by a chest injury or come from a cancer in the chest; that in the present case one of the injuries or all of them together could have caused the cancer; that in his opinion the injuries to the hip sustained on January 9, 1928, were the probable cause of the cancer; that the medical report dated January 14, 1929, which refers to this injury, shows that it apparently existed for a year, and it did seem to be more than a slight injury; that it is possible that the injuries sustained by decedent to his right leg on May 16, 1932, when he was struck by an automobile, could have caused the cancer or could have aggravated it; that another possible cause or aggravation of the kidney condition was the accident on January 4, 1936, when the decedent was struck on the left elbow by the door of a passing automobile; that he thinks that the chest injuries sustained November 1, 1941, while subduing a prisoner, were an aggravation of the kidney condition instead of a cause, for the reason he did not think the degree of pathology existing at the time of death could have developed in that space of time; that no one could say when the cancer started; that to diagnose cancer of the kidney there have to be pathological findings, and by the time there are pathological findings the disease is no longer young; that the cancer attacked the papilla of the kidney and may be one of several varieties, some of which grow rapidly and some slowly; that men live many years with cancer—sometimes as many as 20 or 30 years; that some of the conditions of decedent set forth in his medical history were symptoms of cancer of the kidney such as the diagnosis of indigestion made on May 14, 1930, biliousness on November 19, 1931, hemorrhoids

on March 11, 1935—which are significant in that they are associated with impaired liver function, gall bladder upset on September 8, 1936, lumbago on November 17, 1936—which is the term usually employed when the cause for the backache is not known, upset stomach, loose bowels and continued nausea on February 16, 1940—with no history of error in diet, pleurisy on February 13, 1941—which is not an uncommon symptom, influenza, soreness and congestion in chest on April 17, 1943, and the gastrointestinal upset which caused the operation to be performed. He also testified that the irritation theory of the cause of cancer contemplates repeated trauma; and that in the majority of cases the cancer occurs at the site of the trauma but it sometimes occurs elsewhere.

Dr. Roy W. Johnson, called on behalf of defendant, testified that he is a physician; that he was admitted to practice in California in 1934, and since then has specialized in radiology (the use of X-rays or radium in the treatment of disease) and that cancer constitutes about 80 per cent of his work; that he treats possibly 10 cases of cancer of the kidney in a year; that he had studied the hypothetical question and, assuming the facts therein stated to be true, he did not believe death was caused by the injuries received in line of duty as set forth in the résumé of the medical record in the question; that no one knows the cause of cancer; that he thinks cancer occasionally occurs as the result of just one trauma; that there is such a thing as a cancerous cell, and a dormant cell can become active, break away and travel through the whole body; that it could move out of the lung into the kidney and cause the disease there; that cells from cancers can break off, spread around in the blood or in the lymphatic system to a distant point and grow there; that he has seen cases where the original cancer was the size of a pea, yet there were very large distal metastases; that in many cases the original cancer can be cured but the distant spread kills the patient; that the fact that the hypothetical man complained of pain in his back more or less continuously for some time would impress the witness with the idea he might have cancer of the kidney.

Dr. Jay J. Crane, on behalf of the defendants, testified that he was admitted to practice in California in 1921, and since then has specialized in diseases of the genitourinary tract; that he is now chief of the urological staff at the Los Angeles County general hospital; that he thinks "we see" 24 to 36, maybe 50, cases of cancer of the kidney a year in private

practice and consultation at the general hospital; that decedent's death was not due to any injury he "could determine in the hypothetical question"; that in his opinion cancer of the kidney is not traumatic in origin; that he believes "probably cancer is inherited" in all cases, and he knows of no "authentic case" where they have "proven" cancer resulted from injury; that he doesn't know how you can prove or disprove whether some people have cancer cells in the body; that there is a theory in the medical profession that there are cancer cells; that a cancer cell originates in certain tissue; that it grows without rhyme or reason, and soon grows off its blood supply because it grows so rapidly, then it goes through a process of necrosis, pieces of it break off and parts of that tissue may be carried in the vessels or in the lymph to other tissues; that there is a certain pattern of circulation, and "cancer of the kidney breaks off and goes into the vena cava and the vena cava goes directly into the heart and lungs"; that there is a direct communication between the kidney and the lung, but before cancer of the kidney could be spread to the liver it has to go some place below the vein that carries the digestive fluids from the intestinal tract up to the liver; and that he did not believe decedent had the cancer over two, two and one-half years—maybe one and one-half years, before he died.

The findings challenged on this appeal are numbers 6, 8, 9, and 10, and are to the effect that the immediate cause of decedent's death was carcinoma of the right kidney; that in January, 1928, decedent sustained injuries to his right side and back when he was struck by an automobile; that in August, 1934, when he was struck by an automobile, and in October, 1941, when he was assaulted by a man he was taking into custody, he sustained injuries which aggravated the injuries above referred to; that all of those injuries were sustained during the course of his duty as a police officer; that prior to the injuries sustained in January, 1928, decedent had been "in good health, but immediately thereafter and continuously and progressively up to the time of his death, and as a direct and proximate result" of those injuries, as well as those received thereafter, decedent "commenced" to suffer pain, particularly in his back, abdomen, and sides; that an operation was performed on November 28, 1944, from which he did not recover; and that as the proximate result of the operation and said injuries he died.

As stated above, appellants contend there was no evidence to support those findings, and assert that there was no conflict in the evidence. They argue that the testimony of petitioner and her lay witness is entitled to no evidentiary value for the reason that the hypothetical question contained a letter written by Dr. Brace in which he stated that decedent told him he had been in good health until three weeks prior to entering the hospital on November 20, 1944. That letter was included in the portion of the hypothetical question which "was stipulated to be the facts of this case." Appellants urge, in effect, that by that stipulation the truth of the entire contents of the hypothetical question, with the exception of the testimony of petitioner and her lay witness referred to therein, was established and that therefore petitioner is bound by decedent's declaration that he was in good health until three weeks prior to November 20, 1944. It is not reasonable to suppose that the parties intended to stipulate that decedent was in good health until three weeks prior to November 20, 1944, when the purpose in preparing the hypothetical question and submitting it to medical experts was to obtain their opinions as to the decedent's physical condition over the various years covered by the hypothetical question. If it was intended to stipulate that decedent was in good health prior to November 1, 1944, there would have been no point in considering the question as to his health preceding that date. After the hypothetical question had been admitted in evidence the trial was continued, appellants vigorously presented their defense and inquired at length concerning decedent's health over a period of several years, and it does not appear that they then placed the same construction upon the stipulation as they now urge on appeal. Assuming that decedent believed that he was in good health prior to November 1, 1944, and that he did make the statement, it was at most his opinion as a layman concerning a matter of medical science. Furthermore, in view of the many injuries and illnesses, approximately 58, which were included in the hypothetical question pursuant to the stipulation, it seems clear that it was not intended that the decedent's opinion, as to his health prior to November 1, 1944, was to be determinative of the issue before the trial court. The case was tried upon the theory that the evidence, upon which the hypothetical question was based, was properly before the court, and was proper evidence upon which to base a hypothetical question. Moreover, it could be concluded from the

evidence that decedent had carcinoma of the kidney at the time he made the statement. The hypothetical question shows that a routine examination on November 20, 1944, disclosed a mass in the right upper abdomen, and that a nephrectomy revealed a carcinoma of the right kidney which a medical expert, on behalf of petitioner, testified could not have progressed to that stage since 1941, and a medical expert, on behalf of defendants, testified that he did not believe decedent had the cancer over maybe two, two and one-half years, or maybe one and one-half years.

Appellants also argue, in support of their contention of insufficiency of the evidence, that the opinions of the expert witnesses who testified on behalf of petitioner are entitled to no evidentiary weight. They state that Dr. Rosenkranz is not a cancer specialist, and that Dr. Chase had no training in the treatment of cancer and never treated cancer of the kidney. The record shows that Dr. Rosenkranz is a specialist in urology, which includes the treatment of cancer of the kidney, and that he formerly was chief urologist (for a period of 27 years) for the Los Angeles County general hospital, during which time he saw about 12 cases of cancer of the kidney a year. Dr. Chase testified that he had no special training in the treatment of cancer, but that he had practiced medicine more than 30 years; that he had treated, or operated upon, approximately 36 cases of cancer. Those physicians were qualified as medical experts and their opinions were part of the evidence to be weighed by the trial court. Appellants also state that the opinion of Dr. Rosenkranz that decedent died as the result of injuries received in the performance of his duty was based to a great degree upon the testimony of petitioner and her lay witness, whose testimony they assert was without weight. Although the testimony of the petitioner and her lay witness was not stipulated to be true, it was nevertheless evidence in the case. Furthermore, Dr. Rosenkranz testified on cross-examination that he would be of the same opinion if the testimony of petitioner and her lay witness were eliminated from the hypothetical question, leaving the résumé of the medical records, letters and injury reports.

Appellants further contend that the opinions of petitioner's medical witnesses were based upon mere possibility and assumption, and do not establish a causal connection between the death of decedent and the injuries received by decedent during the course of his employment. In this regard they assert that Dr. Rosenkranz assumed there was a connection

between the injury sustained January 9, 1928, and the cause of death, and the injury sustained November 1, 1941, and the cause of death. Dr. Rosenkranz, as before stated, testified that he based his opinion, that the kidney condition was caused by one or more of the service-connected injuries sustained by decedent, upon the fact, among other things, that he was rather severely injured three or four times, and upon the fact that he had pain from time to time in that kidney region. Referring to the injury sustained on January 9, 1928, petitioner testified that decedent complained at that time of pains across his back, right side and flank. There was also evidence that decedent suffered for many years with periodic backaches. Petitioner and her lay witness so testified, and the hypothetical question shows diagnoses on two occasions of lumbago, which, Dr. Chase testified, is a term used in the medical profession to describe backache when the cause is not known. Appellant's medical expert, Dr. Johnson, testified that the fact that the hypothetical man had backaches more or less continuously for some time would impress him with the idea he might have cancer of the kidney. It therefore cannot be said that Dr. Rosenkranz based his opinion that there was a causal connection between this injury and decedent's death upon possibility and assumption. Referring to the injury on November 1, 1941, there appeared the following questions and answers on cross-examination: "Q. Doctor, is it not a true statement that even though this hypothetical question nowhere states that there is any connection between this chest injury and the kidney condition, that you have assumed that such a connection exists? A. I assume that it exists." "Q. Now, Doctor, insofar as you say that is because the severity of the injury may have caused kidney trouble, that would be an assumption on your part, wouldn't it? A. Could be a possibility." It would seem that appellants consider any conclusion reached by the witness, which is not admitted by the hypothetical question, as an assumption. In other words, it appears that appellants are asserting that the opinion of Dr. Rosenkranz is an assumption, as distinguished from asserting that the basis for his opinion is an assumption. Dr. Rosenkranz testified that on that date (Nov. 1, 1941) the decedent seemed to have suffered a fracture of the chest which would indicate that the injury was rather severe; that anything that injures the chest might cause an injury to the kidney and a severe chest injury might rupture a kidney. Since the

hypothetical question showed that a chest injury had occurred, the expert medical witness was entitled to consider that fact in the light of his learning and experience; and, in view of his testimony that chest injuries may cause injury to a kidney, he was not assuming facts not in evidence in forming his opinion.

Appellants also assert that Dr. Chase "assumed" that the injuries sustained on January 9, 1928, and on November 1, 1941, caused or contributed to causing the cancer. Dr. Chase testified that he thought the evidence was "somewhat less than conclusive" that the injuries sustained on January 9, 1928, caused the cancer, but that he thought they were the probable cause, whereupon counsel for appellants asked "Have you assumed, Doctor, they are the probable cause of the cancer?" To which the witness replied, "I assume these injuries are among those that did cause cancer, I don't know which one did." Dr. Chase also testified that he considered the injury sustained on November 1, 1941, as a "possible cause" of the cancer and counsel for appellants asked, "Well, what did you do in arriving at this opinion, Doctor, assume that it would help cause it?" The witness replied, "I assumed that it, together with other trauma, caused the cancer." The word "assume" was used extensively throughout cross-examination by counsel for appellants in questioning petitioner's expert witnesses. Although that word was used sometimes by the witnesses in answering those questions, it was not used in the sense of a mere supposition. It is evident from their testimony as a whole that those witnesses meant they were of such opinion or belief. Counsel for appellants cross-examined petitioner's expert medical witnesses at length, and questioned them as to the injuries and illnesses which the witnesses considered had any bearing upon the kidney condition. In most instances the witness testified, as to the injuries or illnesses so indicated by him, that the particular injury was a "possible" cause or aggravation of the kidney condition, which he took into consideration, together with all the other possible causes, in forming his opinion as to what did cause the condition. The expert medical testimony on behalf of petitioner and also appellants shows that medical science has discovered no method of determining the exact cause of cancer or the exact time of its origin.

■ Although the burden was upon petitioner to show a causal relation between the duty performed by decedent and the immediate cause of his death (*Platt* v. *City of Los An-*

*geles, supra,* 72 Cal.App.2d 753, 754), it did not require that petitioner establish the cause of the kidney condition beyond any doubt. The existence of a causal relation in cases of this kind is a scientific question requiring expert testimony (*Cordell* v. *City of Los Angeles,* 67 Cal.App.2d 257, 262 [154 P.2d 31].) Some of the testimony given by appellants' experts was conflicting with that given by petitioner's experts, but the trial court resolved all conflicts in favor of petitioner. It was stated in the case of *Cordell* v. *City of Los Angeles, supra,* at page 266: "Where the law requires proof of a fact or facts to be clear and convincing, the sufficiency of evidence to establish a given finding is primarily for the trial court to determine. If there be substantial evidence to support such conclusion, the determination is not open to review on appeal. It being the function of the trial court to determine what facts are established by the evidence, before its conclusion can be set aside upon the ground of 'insufficiency of the evidence' there must be a clear showing that upon no hypothesis whatever is there sufficient substantial evidence to support the decision reached in the court below. We must also assume in favor of the judgment the existence of every fact which could reasonably have been deduced from the evidence. Only when we can conclude that such facts are insufficient to support the judgment rendered may we interfere, because, in such a situation the question becomes one of law." ██ The rule is established that pension laws should be liberally construed and applied with a view to conferring the benefits intended. (*England* v. *City of Long Beach,* 27 Cal.2d 343, 346 [163 P.2d 865]; *Dillard* v. *City of Los Angeles,* 20 Cal.2d 599, 602 [127 P.2d 917]; *Platt* v. *City of Los Angeles, supra,* p. 771.)

The evidence was sufficient to support the findings and the judgment of the trial court. It is unnecessary to consider appellants' further contention that the evidence, exclusive of the expert testimony, was insufficient to support the findings.

The judgment is affirmed.

Shinn, Acting P. J., and Vallee, J. pro tem., concurred.