[Civ. No. 14370. Second Dist., Div. One. Dec. 13, 1944.]

HELEN S. CORDELL, Respondent, v. CITY OF LOS
ANGELES et al., Appellants.

Ray L. Chesebro, City Attorney, Robert J. Stahl and Edward J. Olstyn, Deputies City Attorney, for Appellants.

Joseph Scott and J. Howard Ziemann for Respondent.

WHITE, J.—This is an appeal from a judgment awarding a pension to the widow of a member of the Los Angeles Fire Department who died on the 10th day of September, 1940, following an operation for the removal of his appendix.

Respondent herein is the widow of Charles J. Cordell, who, for a period of about seventeen years immediately preceding his demise, had continuously served as an auto fireman and driver of a fire truck for the Fire Department of the City of Los Angeles. It is conceded that Mr. Cordell was, at all times during his service, a member of the fire department within the contemplation of the provisions of sections 180 to 189, inclusive, of the Charter of the City of Los Angeles, and that, had

he lived and continued to serve for the requisite number of years, he would have been entitled to a pension.

Respondent widow's claim to a pension is based upon the provisions of section 183 of the city charter, which entitles her thereto if her husband died "as a result of any injury received during the performance of his duty, or from sickness caused by the discharge of such duty."

Prior to the commencement of this action, respondent filed with appellant Board of Pension Commissioners of the City of Los Angeles her application for a pension pursuant to the terms of section 183 of the city charter and which application was denied by said board. She thereupon filed in the Superior Court of Los Angeles County her petition for a writ of mandate to compel the city and said board to approve her application and pay the pension therein demanded. Following trial before the court, a judgment was rendered directing the issuance of a peremptory writ of mandate commanding said board of pension commissioners to grant respondent herein a pension as the surviving widow of a member of said fire department.

From such judgment, the city of Los Angeles and its board of pension commissioners prosecute this appeal.

For purposes of convenience, the city of Los Angeles and said board will hereinafter be referred to as "appellants" and petitioner in the court below, Helen S. Cordell, will be designated as "respondent."

The particular findings of the trial court which are challenged on this appeal read as follows:

"That the said Charles J. Cordell died on the 10th day of September, 1940, as a result of injuries received during the performance of his duty and from sickness caused by the discharge of his duty as a member of the Fire Department of the City of Los Angeles;

"That the immediate cause of the death of Charles J. Cordell was a failure of his kidneys to function properly following an operation for appendicitis; and that the said failure of decedent's kidneys to function properly was directly and proximately caused by injuries received and sickness caused by and during the performance of decedent's duty as a member of the Fire Department of the City of Los Angeles; and by a pre-existing condition and disease of decedent's kidneys and appendix which was accelerated and aggravated by injuries received and sickness caused by and during the perform-

ance of decedent's duty as a member of the Fire Department of the City of Los Angeles,'' and

''That Charles J. Cordell during and by the performance of his duty as a member of the Fire Department of the City of Los Angeles was repeatedly subjected to exposure and to inclement, wet and cold weather, and while fighting fire in the performance of his duty as a fireman he was on many occasions drenched by the fire hose and water used in fighting fires, and that said exposures and drenchings were detrimental to his health, and directly and proximately accelerated and aggravated a pre-existing condition and disease of his kidneys and appendix, and directly and proximately caused his death.''

It is earnestly urged by appellants that the record is barren of any evidence establishing a causal connection between the fireman's death and his service in the fire department. It therefore becomes necessary to examine the evidence to determine whether, by a preponderance thereof, it was established that the immediate cause of Mr. Cordell's death, ''a failure of his kidneys to function properly following an operation for appendicitis,'' was directly and proximately attributable to injuries received and sickness caused by and during the performance by him of his duties as a member of the fire department of appellant city. In that regard, the evidence reflects that Mr. Cordell entered the fire department in 1923, when he was about twenty-eight years of age; that he was in good health until the 29th day of January, 1937. On this date, while cleaning fire apparatus at the firehouse, he slipped from the running board of a fire truck and sprained his back, causing him such severe pain that it was necessary to relieve him from duty later in the day. He remained at home and suffered great pain. His condition was diagnosed as a sacral strain, for which treatment by way of short wave diathermy to the back, with massage, was administered. On February 24, 1937, he was ''found O.K. for work.'' Three days before the occurrence of this injury, the decedent had received medical attention for an unlocalized pain in the abdómen.

On February 3, 1940, while running across the handball court at the fire station in response to an alarm, decedent slipped and fell so heavily upon his back that he was unable to arise, and had to be assisted to his feet. Decedent, however, responded to the alarm and drove the apparatus to a fire, but was unable to drive the fire truck on the return trip and a

relief driver was assigned to that duty. In the fire station "log" this mishap to decedent was thus recorded: "It was a very hard fall."

On May 17, 1940, while taking part in the rescue of a boy on a cliff, decedent, during the performance of his duty, was lowered over the cliff with a safety belt to which a rope was attached in the front but which had no support around the hips or crotch, his entire weight being supported by the belt around his waist; the decedent was lowered over the cliff about 100 feet to the place where the boy was located, and he took the boy in one arm, held the rope with the other hand, and was then pulled up the cliff by the firemen on the top. About half way from the top the boy started to slip from decedent's grasp and decedent let go of the rope with his other hand to seize the boy to prevent him from falling, thus throwing his and the boy's entire weight upon the safety belt which was fastened around decedent's waist. Decedent called to the men at the top holding the rope, stating that he was hurt and asking them to wait before pulling him up further. After a few minutes' wait the ascent was completed. Upon reaching safety, decedent was in great agony and had to lie down and one of the firemen at the top of the cliff said, "He looked sickly, greenish and palish" and appeared to have to faint; decedent remained on the ground for awhile before he was taken back to the fire station, and from then on and until his death, he complained about pain in his side in the abdominal region. Decedent's widow, respondent herein, testified that from that time on he "got very bad" and that they tried in several ways to determine what the trouble was, but that no satisfactory diagnosis was ever reached.

With reference to decedent's condition following this accident, respondent testified: "After he pulled this boy up the cliff he was very exhausted, and said he didn't know whether he could make it or not, because it was a terrible haul up the bank, and he was very ill after that, and complained, and from then on he went down very fast. After 1937, after the fall from the truck, he had declined very much." When asked what the decedent said as to how he felt and as to where the pain was located, respondent testified that her husband told her "in his kidney and back and all through the abdominal region. . . ."

On September 6, 1940, decedent was stricken with an acute

pain in the abdomen, accompanied by severe prostration and dyspnea, which was at first diagnosed as "possible coronary occlusion, or myocardial degeneration." However, on the following morning, after the visit of another physician, Mr. Cordell was removed to the Queen of Angels Hospital, where an appendectomy was performed. His immediate post-operative condition was good, but two days after the operation Mr. Cordell, according to his wife, "continued to go down" until he expired on the morning of September 10, 1940, because of the failure of his kidneys to function properly following the appendectomy.

It has been held that the words "shall die as a result of any injury received during the performance of his duty," as used in section 183 of the city charter, mean that a causal relation, mediate or immediate, must be shown between the duty performed by the decedent and the immediate cause of his death (*Lawrence* v. *City of Los Angeles,* 53 Cal.App.2d 6, 10 [127 P.2d 931]). ■ In the instant case, the existence of such causal connection is necessarily a scientific question, upon which it is necessary to obtain the scientific knowledge of experts trained in such scientific subject. Expert testimony is therefore essential (*Wm. Simpson C. Co.* v. *Industrial Acc. Com.,* 74 Cal.App. 239 [240 P. 58]; *Newton* v. *Industrial Acc. Com.,* 204 Cal. 185 [267 P. 542, 60 A.L.R. 1279]; *State Compensation Insurance Fund* v. *Industrial Acc. Com.,* 195 Cal. 174 [231 P. 996]). ■ With these rules before us, we find in the record the testimony of Dr. Thomas J. O. Volkmann, an osteopathic physician since 1907 and who also in 1927 qualified before the State Board of Medical Examiners for a physician's and surgeon's license. This doctor first treated the decedent in April 1937, following the injury sustained by the latter in the performance of his duties when he fell from a fire truck. The witness testified that it was his opinion that in 1937 the decedent had a spinal cord injury coupled with meningeal hemorrhages; that he had great difficulty in getting the patient onto the table. The witness further testified that he advised Mr. Cordell "You may not realize it, but in my reasoning and judgment you are more severely injured than what you think."

On August 27, 1938, decedent again called upon Dr. Volkmann, stating that "the work is rather strenuous for me, and I go home feeling just worn out sometimes." The doctor testified that he then found decedent suffering from "almost the

same condition I experienced the first time'' (April 1937), and again admonished the patient that his injury ''was more serious than what he anticipated or contemplated.''

After decedent's fall in the course of his employment on February 3, 1940, Dr. Volkmann again treated him professionally and, with reference to Mr. Cordell's condition on that occasion, the witness testified:

''On this occasion I found that he was injured very much more than he was on the previous occasion. In my opinion and in my reasoning, I think, going to the degenerative processes that were working in the body from 1937 to 1940, it extended to such an area that this fall, in my opinion, was the thing that created considerable degeneration in the whole nervous system and involving the plasmic fluids of the body.

''Q. All right. What did you notice about him in February, 1940? A. When he came in, he was almost carried in by Mrs. Cordell.''

In July, 1940, following the injury sustained by decedent when rescuing the boy on the cliff, Dr. Volkmann again examined and treated him. With reference to his findings upon that occasion, the witness testified:

''A. When I saw Mr. Cordell at that visit when he was lying on his cot, he pulled up his under-garment, I just put my hand under the right costal arch—

''Q. Where is that? A. Under the lower ribs—and asked him to take a breath, and when he took the breath I could feel the kidney come down.

''Q. Where is the Kidney? A. Right at the lower pelvis.

''Q. In the front of the body or behind? A. In the front. I felt the kidney come down, when he said, 'Doctor, that is very very painful.' I felt it myself. I said 'Mr. Cordell, you had better get immediate attention.' I understand after that——

''Q. Never mind about that. You told him he should get immediate attention? A. Yes. Then I left him.

''Q. Why did you say that? A. Because I felt that he was dangerously sick.

''Q. Will you explain to us what you mean by saying the kidney fell down? Explain that more specifically, please. A. Well, it departed lower than its normal region.

''Q. In other words, the kidney is attached to some part of the anatomy? A. Yes.

"Q. Where? A. Up under the liver and diaphragm.

"Q. And what caused the kidney to fall? A. As he breathed, the diaphragm came down and lowered the kidney some. Stretched it from the membrane."

The doctor also explained on cross-examination that normally the kidney is not a movable organ and that "it is a fixed organ, except by some pathological condition." The witness also testified that in his opinion decedent never had recovered from the condition in which he found him in April, 1937, and which ailment was occasioned in the performance of decedent's duty as a fireman when he fell from a fire truck.

Another expert witness was Dr. Harry H. Wilson, whose qualifications included graduation in 1915 from the College of Medicine of the University of Illinois; Fellow of the American College of Physicians; teacher in medical schools; six years secretary of the Los Angeles County Medical Association and president for one year; councillor of the California Medical Association for ten years and president for one year. There was propounded to this witness a lengthy hypothetical question embodying all of the facts elicited in the testimony concerning the decedent from the time he entered the fire department until his death. After this witness testified that the decedent died from failure of his kidneys to eliminate the toxin after the appendectomy, the record discloses the following testimony:

"Q. *Failure of the kidneys. An operation for appendicitis, would that in any way contribute to it?* A. *It brought about the failure of the kidneys, a predisposing factor which threw shock upon the kidneys.*

"Q. Were the kidneys in bad condition? A. Apparently not.

"Q. It must not have developed before that? A. I don't think so, and sometimes the actual tissue changes are not an indication of how things work, and Dr. Zeiler in his examination did not find many actual tissue changes, not sufficient, as he states, to account for death. *The facts are, however, that at one time the patient was given 500 cc of citrate of blood, and they could only get 20 cc from his bladder, so the kidneys could not filter through his circulatory system into his bladder, so taking into consideration what the pathologist found, the man died from failure of his kidneys to eliminate the toxin.*

"Q. That is what I want to know. A. Yes.

"Q. Can you explain a little further in detail, Doctor, how the condition of his kidneys could be aggravated by exposure or strain or abnormal activity, or the life of this man in his duties as a fireman? A. *Well, assuming that the statement contained in the history, that he had had a severe Bright's disease, I think it said 25 years before, is true in this hypothetical man, then that hypothetical man should not have been exposed to fatigue, wet, or colds, he should have adapted his life to one of relative sedentary work, protected from either the elements or artificial wetting, and should have worn the types of clothing that did not allow surface changes of temperature to occur repeatedly, and to moderate his diet is very important,* and to have avoided the use of alcohol and to have attempted in every way to protect the elimination and the metabolic processes of the body."

In discussing the causes which led to appendicitis, the witness testified:

"We do not know for a fact what causes one person to have an excitation and infection in his appendix. In foreign bodies, trauma does play a relatively important part. *Fatigue and lowered resistance play a more important part, I think, the same as it does in a cold in our nose. If we do anything that lowers our resistance and bacteria are available to pounce upon us when we are down, they will do so.*"

This same witness testified as follows:

"Q. Do you think, Doctor, wouldn't the several normal urinalyses made at the time of the dates that I have stated, rule out the possibility or probability certainly of there being any results of the Bright's disease in the kidneys? A. Not at all.

"Q. Not at all? A. *Not at all. We see women who have a very severe kidney damage, nearly lose their lives in childbirth and recover and their blood pressure and urine remain entirely normal until through some later experience in life there is strain on them.*"

While it is true there was other expert testimony from which the conclusion might be drawn that there was no causal connection between the immediate cause of decedent's death and his duties in the fire department, the rule is too well established to require citation of authorities, that an appellate tribunal will not disturb the findings of fact of a trial court because of a conflict of evidence, and that is true even though

the reviewing court may feel that it would have found the facts differently had it been the trier thereof. Where the law requires proof of a fact or facts to be clear and convincing, the sufficiency of evidence to establish a given finding is primarily for the trial court to determine. If there be substantial evidence to support such conclusion, the determination is not open to review on appeal. It being the function of the trial court to determine what facts are established by the evidence, before its conclusion can be set aside upon the ground of "insufficiency of the evidence" there must be a clear showing that upon no hypothesis whatever is there sufficient substantial evidence to support the decision reached in the court below. We must also assume in favor of the judgment the existence of every fact which could reasonably have been deduced from the evidence. Only when we can conclude that such facts are insufficient to support the judgment rendered may we interfere, because, in such a situation the question becomes one of law. The evidence in the instant case does not warrant a reversal on the ground of its insufficiency to support the judgment rendered. Although there was in the record expert testimony in conflict with that herein narrated, such testimony is to be given the weight to which it appears to the trial judge in each case to be entitled. The law makes no distinction between that kind of testimony and evidence of other character (*State Compensation Insurance Fund* v. *Industrial Acc. Com., supra,* at page 184).

 Neither can we be unmindful of the rule so firmly established in this state that pension legislation must be liberally construed and applied to the end that the beneficent results of such legislation may be achieved. Pension provisions in our law are founded upon sound public policy and with the objects of protecting, in a proper case, the pensioner and his dependents against economic insecurity. In order to confer the benefits intended, such legislation should be applied fairly and broadly. In the case at bar, there is ample evidence warranting the inference that the physical condition of the kidneys of the decedent aggravated his post-operative condition and directly and proximately contributed to his demise. As was said by our Supreme Court in the late case of *McKeag* v. *Board of Pension Commissioners,* 21 Cal.2d 386, 390 [132 P.2d 198]:

"The language of section 185 ought not to be interpreted narrowly. Rather, a liberal construction is to be given, in

accordance with the rule ordinarily used in construing pension legislation. (*O'Dea* v. *Cook,* 176 Cal. 659 [169 P. 366]; *Casserly* v. *City of Oakland,* 215 Cal. 600 [12 P.2d 425]; *Dillard* v. *City of Los Angeles,* 20 Cal.2d 599 [127 P.2d 917].) As was said in *Hurley* v. *Sykes, supra,* [69 Cal.App. 310 (231 P. 748)], p. 316, 'In ascertaining the intent and meaning of the charter provision a liberal construction should be indulged in to carry out the beneficial purposes aimed at. (Citing cases.) The spirit of these provisions is to protect all members of the fire department in the benefits which the fund insures, and they should not be narrowed by any strict or technical construction but should be interpreted on broad principles. Any other construction would result in a limitation of the beneficial provisions of the act, and render nugatory the manifest intention of the law-making power and do violence to its apparent purpose.' (See, also, *Walton* v. *Cotton,* 19 How. (U.S.) 355-358 [15 L.Ed. 658].)''

That the policy in this state is to construe provisions of the character here involved liberally, serving as they do a beneficial purpose, was also the holding in *Casserly* v. *City of Oakland,* 215 Cal. 600, 603 [12 P.2d 425].

■ Finally, appellants assail the action of the trial court in overruling their objection to the assumption in the aforesaid hypothetical question propounded to Dr. Harry H. Wilson that the decedent was ''repeatedly subjected to exposure and to cold and wet weather, and water from fire-fighting''; that ''during at least the last two years of the life of our hypothetical man his duties as a fireman required his repeated exposure to inclement weather, cold, dampness, and wet at fires . . . and that on many occasions at fires he . . . would be drenched with water.'' It is argued by appellants that there is no evidence in the record upon which these assumptions could be predicated. But the record does contain testimony by one fireman that when a ''run'' was made the decedent, in common with other firemen, would be ''exposed to rain and anything, any kind of weather.'' Another fireman testified to the same effect, while a third gave evidence that the decedent, after arriving at a fire, would handle the hose and perform the usual duties of the firemen upon such occasions; that decedent was exposed to water, and that when there was a fire ''we were apt to get wet.'' Respondent, Mrs. Cordell, also testified that many times upon the return of her

husband from a fire when she would see him at the fire station "he would be soaking wet." It is also worthy of note that in their brief appellants state "that firemen are exposed to whatever the weather might happen to be when they have an alarm of fire, and that they might become wet from water used in extinguishing fire, is, of course, a self-evident proposition requiring no evidence."

In the case at bar, the foregoing admittedly "self-evident" proposition is supported by evidence of and concerning the facts upon which the hypothetical question was framed.

A careful examination of the record herein discloses sufficient evidence to support the findings and judgment.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.