[Civ. No. 14986. Second Dist., Div. One. May 24, 1946.]

RALPH O. WILLIAMS, Respondent, v. G. E. KINSEY, Appellant.

W. T. Stockman, Henry G. Bodkin and Bodkin, Breslin & Luddy for Appellant.

Clifford E. Hughes and Meserve, Mumper & Hughes for Respondent.

WHITE, J.—Defendant appeals from an adverse judgment.

It appears from the record that during the year 1941 plaintiff was a licensed real estate broker actively engaged in such business in the city of Los Angeles. Defendant, though not a licensed real estate broker, was an operator in real estate on a more or less large scale. He published and circulated among some 800 real estate brokers, including plaintiff, brochures in which he set forth his holdings on which he was open to proposals. Through these brochures defendant advertised that he dealt through brokers only and would pay a real estate commission to any one effecting a transaction involving one of his properties. Plaintiff was aware of such advertisements, and was also aware of the fact that Asa V. Call was the owner of a large estate property improved with a residence, in the city of Beverly Hills, which Mr. Call was interested in disposing of, and plaintiff felt he could be instrumental in bringing about a transaction whereby the defendant might exchange one of his properties for the above mentioned property of Mr. Call. In the fall of 1941 plaintiff took defendant to see the Call property and interested him in acquiring

it. At defendant's suggestion, plaintiff submitted to Mr. Call three of the former's properties, but no deal was consummated. There is in the record substantial evidence that plaintiff first brought defendant and Asa V. Call together in an effort to effectuate a transaction under the terms of which Mr. Call would exchange his residence for one of defendant's properties and that defendant was to pay plaintiff a commission in the event such a transaction eventuated between defendant and Mr. Call. The record further reflects the fact that there was no agreement in writing calling for the payment of a commission, because, as testified by plaintiff, "it was useless to have a contract signed in advance for a commission where the deal was an exchange, because it was impossible to describe the transaction before a deal was actually worked out."

It further appears that on or about December 1, 1941, plaintiff learned that defendant was acquiring certain property known as Beaconsfield Manor, and he thereupon went to the defendant, inquiring of him if he was interested in exchanging Beaconsfield Manor for Mr. Call's property. Defendant informed plaintiff at that time that he had already opened negotiations with Mr. Call to effect an exchange thereof for Mr. Call's property through defendant's salaried employee, Mr. Grunwald. Defendant also told plaintiff that the latter was not to talk to Mr. Call, but was to "keep your hands off, I will pay your commission of $5,000." According to plaintiff's testimony, defendant advised him that he had earned his commission by bringing Mr. Call and the defendant together and that if defendant was successful in effecting a trade of any of his properties involving the Call residence he would see that respondent "was protected on any commission that he had coming from Mr. Call." There is also testimony that defendant further stated that when the negotiations got to the point where escrow instructions were to be signed, plaintiff would be notified and could go to the bank with the other parties where the escrow was to held, at which time proper escrow instructions would be worked out providing for the payment of the commission to which plaintiff was entitled from Mr. Call and from the defendant, to which plaintiff agreed.

There is also contained in the record evidence that on December 8, 1941, Mr. Call and defendant opened an escrow providing for the exchange of Beaconsfield Manor for the

Call residence; that plaintiff was not notified thereof and no provision was made for the payment of any commission to him by either party. Upon discovering that Mr. Call and defendant had signed escrow instructions without his knowledge, thereby leaving him with no written agreement regarding his compensation, plaintiff contacted defendant. Upon the defendant's suggestion, plaintiff attempted to get in touch with Mr. Call, but was unsuccessful, and after several days advised the defendant that he knew of no way to protect himself under the circumstances other than to file a lien for his commissions against the escrow. In this regard plaintiff testified that defendant said "he would give me an agreement that would protect me all the way around. He stated Mr. Call had beaten him down on his margin in the deal and that he could not pay me any cash commission; that he figured that he was entitled to a minimum of 15% profit on the exchange of Beaconsfield for the Call residence, and that therefore he was going to put the Call house into my deal with him on my commission at $30,000; that when he sold the Call house he would give me one-half of the net proceeds of the sale above $30,000; that since we did not know how much commission Mr. Call was going to pay, we would throw all of the commissions into one pot and divide them equally. He said that in this way he thought that I would make an amount that would total more than a 5% commission on both sides of the deal." Thereupon defendant wrote out and handed to plaintiff an agreement, dated December 23, 1941, reading as follows:

"It is understood that in lieu of my paying you a commission on the Call, Beaconsfield trade, I will pay you one-half of the net proceeds of the sale of the Call house above $30,000. You are to pay me one-half of commission you collect from Call."

Subsequently the escrow was closed, on December 31, 1941, and Mr. Call got the Beaconsfield Manor while appellant got Mr. Call's residence. Thereafter Mr. Call paid plaintiff a commission of $850, and defendant paid plaintiff $500, which sum, according to the latter's testimony, was on account of commissions. Thereafter defendant sold the house he had acquired from Mr. Call for $55,000 and received the money therefor. Upon discovering the sale, plaintiff demanded his compensation pursuant to the aforesaid contract of December 23, 1941, and defendant declined to pay plaintiff any further

compensation in addition to what he had already paid. At that time defendant rendered plaintiff a statement setting forth the disposition of the funds received from the sale of the Call property, taking credit for $425, being one-half the commission Mr. Call paid plaintiff, and the $500 which defendant had paid to plaintiff. Thereupon this action ensued.

Plaintiff's complaint pleads the foregoing facts in the first cause of action thereof and in the second cause of action sets up a common count for money had and received. Plaintiff's prayer was for judgment against the defendant for the sum of $10,521.75, with interest thereon at the rate of 7 per cent per annum from September 25, 1943. By his answer defendant denied he advanced $500 or any other sum to plaintiff as a commission, but on the contrary alleged that the $500 was paid in full settlement of the claim under the aforesaid written contract; denied that he had rendered a statement showing the net profit to be $1,389.69 or any other sum, but alleged that the aforesaid statement was defendant's ledger sheet showing net profits, furnished to plaintiff's attorney at his request. The answer further denied any sum was due for money had and received.

By his answer defendant also set up various defenses, the first of which alleged that concurrently with defendant's agreement to pay plaintiff one-half of the net proceeds on the sale of the Call residence over $30,000, plaintiff agreed that he would use his best efforts in selling the Call residence and would accomplish it in a few weeks, for a substantial profit; alleged that defendant relied upon the representation and believed plaintiff, which plaintiff knew; that plaintiff intended that defendant should rely upon the statement, knew it was false, and did not intend to use his best efforts to sell the Call residence, nor did he believe he could sell it, but intended to deceive defendant. As a second affirmative defense, defendant alleged that the claim of plaintiff was compromised and settled March 5, 1942, upon the payment of the aforesaid $500. For a third separate defense, it was alleged that if any sum were due plaintiff it was not in excess of one-half of $1,318.69, as itemized in the above mentioned statement, which, in itemized form, was attached to defendant's answer, less closing costs of the deal, at that time undetermined.

Following trial before the court, sitting without a jury, judgment was rendered in favor of plaintiff and against the

defendant for the sum of $3,582.05, from which judgment defendant prosecutes this appeal.

Appellant concedes, with reference to his second affirmative defense, that the court found upon conflicting evidence that the $500 paid in March, 1942, was merely a payment on account and not in full settlement of the contract, as claimed by defendant. Appellant also concedes, with reference to his first affirmative defense, that there was a substantial conflict in the evidence with reference thereto and that the court found against defendant's contention in regard to his claim that after payment of the aforesaid $500 no effort was made by plaintiff to sell the Call property. Because these findings are based upon conflicting evidence of a substantial nature, defendant has abandoned these defenses on appeal.

The main ground urged by appellant for a reversal is that the judgment is contrary to law, in that the indisputable evidence shows that while plaintiff was a licensed real estate broker under the laws of the State of California (California Real Estate Act, Stats. 1919, p. 1252, as amended; now Bus. & Prof. Code, ch. 3, §§ 10130 to 10221), that neither defendant nor his salaried employee, Mr. Grunwald, who proposed to Mr. Call that the latter trade his residence for the defendant's Beaconsfield property, was a licensed real estate broker or salesman; that the aforesaid contract of December 23, 1941, upon which recovery was sought herein provided that plaintiff's compensation for services rendered in consummating an exchange of properties contemplated that plaintiff should pay to defendant one-half the real estate commission he received from Asa V. Call for services defendant and his employee rendered in consummating the exchange; that the agreement being indivisible, plaintiff's compensation cannot be arrived at without taking into consideration such compensation received from Asa Call; and that said contract therefore contravenes the express provisions of the laws of this state (§ 2, Cal. Real Estate Act, now Bus. & Prof. Code, § 10134).

Section 2 of the California Real Estate Act, in effect at the time herein pertinent, provided (in part):

"One act, for a compensation of buying or selling real estate of or for another, or offering for another to buy or sell or exchange real estate, or negotiating the purchase or sale or exchange of, or listing or soliciting prospective purchasers of real estate, or negotiating a loan on or leasing or renting or

placing for rent real estate, or collecting rent therefrom shall constitute the person, copartnership or corporation making such offer, sale or purchase, exchange or lease, or negotiating said loan, or so renting or placing for rent or collecting said rent or listing or soliciting, a real estate broker or salesman within the meaning of this act.''

Section 18 of the same act provided:

''It shall be unlawful for any licensed broker to pay any compensation for performing any of the acts herein specified to any person who is not a licensed broker, or a salesman licensed under the broker paying the compensation, and no real estate salesman shall be employed by or accept compensation from any person other than the broker under whom he is at the time licensed. It shall be unlawful for any licensed real estate salesman to pay any compensation for performing any of the acts specified in section 2 hereof to any licensee except through the broker under whom he is at the time licensed. It shall be a misdemeanor for any person, firm or corporation, whether obligor, escrow holder or otherwise, to pay or deliver to anyone a compensation for performing any of the acts specified in section 2 hereof, who shall not be known to be, or present evidence to such payor that he is a regularly licensed real estate broker at the time such compensation is earned. Punishment for said misdemeanor shall be a fine not exceeding fifty dollars for any one offense.

''*Employment or compensation of unlicensed person.* No licensed broker shall employ or compensate directly or indirectly any person for performing any of the acts specified in section 2 of this act who is not a licensed broker or who is not a salesman licensed under the broker employing, or paying the compensation to, such person.''

The court found that plaintiff was a licensed real estate broker at the time of the transaction here in question and that at such time the defendant was not so licensed. The court further found ''that thereafter and on or about the 1st day of December, 1941, defendant acquired Beaconsfield Manor, and through his agents and representatives and without the knowledge of plaintiff, interested Mr. Call in exchanging the Call property for Beaconsfield Manor; that the escrow instructions wherein and whereby it was arranged that the Beaconsfield Manor was to be exchanged for the Call property, were signed by the defendant and by Mr. Call without the participation of plaintiff, and without the plaintiff having

talked to Mr. Call concerning the same; that plaintiff did not act as the agent for Asa V. Call or defendant, or arrange any of the terms of the exchange of the Beaconsfield Manor for the Call property, but acted as a mere middleman who brought said parties together in an attempt to effect an exchange of the Call property for property, other than Beaconsfield Manor, belonging to the defendant, and that defendant and Mr. Call arranged the terms of the exchange of Beaconsfield Manor for the Call residence between themselves, without the assistance of plaintiff.''

It was further found by the court ''that plaintiff had collected a commission of $850 from Mr. Call some time in the month of February, 1942, and that plaintiff and defendant agreed that the said commission and the net proceeds of the sale of the Call house above $30,000 was (sic) to be put in one pot and divided equally between plaintiff and defendant as the means of determining and paying the amount due plaintiff in lieu of a commission on the Beaconsfield-Call exchange; that it is true that the $500 paid by defendant to Plaintiff on the 5th day of March, 1942, was paid by defendant to plaintiff on account of the commission to which he would ultimately be entitled when the Call property was sold; . . .''

The first question presented is whether, under the facts herein, it was the agreement between the parties that plaintiff, a licensed broker, should split his compensation as such real estate broker with defendant, an unlicensed person, a portion of the services for which compensation was to be received having been performed by defendant, an unlicensed person, through his salaried employee, also an unlicensed person.

At the time here pertinent section 18 of the Real Estate Act made it unlawful for ''any licensed broker to pay any compensation *for performing any of the acts herein specified* to any person who is not a licensed broker, or a salesman licensed under the broker paying the compensation. . . .'' (Emphasis added.) The query therefore arises, what are ''any of the acts herein specified''? Manifestly, the Real Estate Act intended to make it unlawful for a licensed broker to divide his compensation with any unlicensed person who performed any of the services of a broker in the consummation of a deal. The question then arises, did the defendant act as a broker in the transaction with which we are here concerned? Section 2 of the Real Estate Act declares the follow-

ing acts to constitute one a broker or salesman: "One act, for a compensation, of buying or selling real estate *of or for another,* or offering *for another* to buy or sell or exchange real estate, or negotiating the purchase or sale or exchange of . . . real estate. . . ." (Italics added.) In the exchange of the Call residence for the Beaconsfield Manor apartments there were only two parties. Mr. Call was one and the defendant, as owner of the Beaconsfield Manor apartments, was the other. From the record it is obvious that defendant was not Mr. Call's broker, and certainly defendant could not employ himself as his own broker, nor did plaintiff employ defendant as his broker. The court found that plaintiff brought the principals together and that they arranged among themselves, as owners of the respective properties involved, to negotiate the terms of the deal. That when one deals with his own property his negotiations with reference to the sale or exchange thereof do not constitute him a broker within the meaning of the act, under the facts here presented, is evidenced by section 2 thereof, which provides that "the provisions of this act, except as to sections 19a and 20a to 20 1 inclusive" (not here involved) "shall not apply to anyone who shall directly perform any of the acts aforesaid with reference to his own property. . . ."

The purpose of the Real Estate Act is not to raise revenue, but to protect the public (*Firpo* v. *Murphy,* 72 Cal. App. 249, 253 [236 P. 968]), and therefore it does not by its specific terms require a person to be licensed in order to act with regard to his own property or affairs. As to what was the agreement between the parties, the court, upon conflicting but substantial evidence, found "that it is true that plaintiff had collected a commission of $850 from Mr. Call some time in the month of February, 1942, and that plaintiff and defendant agreed that the said commission and the net proceeds of the sale of the Call house above $30,000 was to be put in one pot and divided equally between plaintiff and defendant as the means of determining and paying the amount due plaintiff in lieu of a commission on the Beaconsfield-Call exchange; . . ." The court's finding in this regard removes the agreement in question from the category of agreements inhibited by the Real Estate Act. Furthermore, we are convinced that the defendant, acting as a principal and not as a broker in connection with his own property, was not performing "any of the acts" specified in the Real Estate Act, was

not a broker, and does not therefore come within either the letter, spirit or meaning of the provisions of the act which make certain agreements between brokers and unlicensed persons unlawful.

■ Appellant next contends that the court erred in its finding numbered III, reading in part, "that plaintiff did not arrange for the exchange of the 'Call house' for 'Beaconsfield', but merely brought the owners of said properties together prior to the first day of December, 1941, as hereinafter found." Appellant argues that the undisputed evidence shows that the parties were brought together as to other property only; that respondent's contract with appellant was special and not general; that the former performed no services in connection with the trade of properties that was consummated and is therefore not entitled to recover. That respondent originally brought appellant and Mr. Call together cannot be disputed. The evidence in that regard is without contradiction. If this "bringing together" of Mr. Call and appellant was the effective cause of the particular deal that was finally made, then respondent is entitled to recover. (*Neiswender* v. *Campbell*, 119 Cal.App. 504, 507 [6 P.2d 584].)

■ Furthermore, after respondent had initiated the negotiations for an exchange of properties between appellant and Mr. Call, the former took the matter into his own hands and completed an exchange by himself with the aid of his salaried employee. Respondent was thereby so completely discharged from responsibility that appellant is estopped to contend against respondent broker's claim for a commission on the ground that the latter did not actually participate in the negotiations which resulted in appellant and the party to whom respondent introduced appellant consummating a deal. (*Larrabee* v. *Republic Bond etc. Co.*, 100 Cal.App. 447, 451 [280 P. 149] ; *Leckey* v. *Holst*, 97 Cal.App. 698, 701 [275 P. 1015] ; 4 Cal.Jur. § 21, p. 577; 2 Am.Jur., "Agency," §§ 304 to 306; 45 L.R.A. 51; 14 A.L.R. 472; *Green* v. *Robertson*, 64 Cal. 75, 76 [28 P. 446] ; *Clark* v. *Allen*, 125 Cal. 276, 279 [57 P. 985] ; *King* v. *Reed*, 24 Cal.App. 229, 236 [141 P. 41].) The cases cited and relied upon by appellant are easily distinguishable from the case at bar in their respective factual backgrounds.

■ Although in conflict, there is nevertheless substantial evidence in the record to show that respondent acted in the

capacity of a middleman—in other words, a broker who brings seller and buyer, or the parties to an exchange of properties, together. In his capacity as such middleman the broker need have nothing to do with actually negotiating the bargain. (*Ryan* v. *Walker*, 35 Cal.App. 116, 119 [169 P. 417].) Contrary to appellant's contention, finding III does find the ultimate facts alleged in paragraph III of the complaint as it stood following amendment and at the time the finding was made, namely, that respondent as a middleman brought appellant and Mr. Call together; that appellant and Mr. Call themselves negotiated the terms of the exchange of the Call residence for appellant's Beaconsfield Manor apartments, and that respondent thereby became entitled to two commissions—one from Mr. Call and another from appellant—; that Mr. Call paid the commission he owed and appellant gave respondent the aforesaid contract of December 23, 1941, instead of paying the commission he owed to respondent. The phrase "as hereinafter found" refers to finding VII, where it was comprehensively set forth that while respondent did not arrange the terms of the exchange agreed upon, he acted as a middleman and that the parties themselves arranged the terms of the transaction. The challenged finding III finds support in the testimony given by respondent that after bringing Mr. Call and appellant together he learned that appellant was acquiring Beaconsfield Manor in the latter part of November, 1941, and told appellant that he thought it would be a good deal for Mr. Call; that he had been theretofore and was at that time attempting to arrange an exchange of the Call property for one of appellant's properties, and that several deals had been considered. Appellant told respondent that his employee, Mr. Grunwald, had already proposed through Mr. Rolapp, an employee of the Pacific Mutual Life Insurance Company, that Mr. Call consider trading his residence for Beaconsfield. Respondent at that time told appellant that it was odd that appellant's employee should "go behind respondent's back" and try to make a deal directly. Appellant then explained that Mr. Grunwald and Mr. Rolapp were very good friends; that the deal was progressing nicely, and that he, appellant, considered that the deal had better chances of eventuating if respondent kept his hands off of it. At that time appellant told respondent that he, appellant, would pay respondent a commission of $5,000; "that if he" (appellant)

"was successful in effecting a trade of *any* of his property involving the taking of the Call residence, Mr. Grunwald would see that I" (respondent) "was protected on any commission that I had coming from Mr. Call"; that respondent had put Mr. Call in touch with appellant; that Mr. Call was respondent's prospect and that respondent had earned his commission in bringing Mr. Call and appellant together, and that respondent might spoil the deal, which was apparently progressing very nicely, "if he were to get in there and start talking to Mr. Call and his people." Appellant told respondent that when the negotiations got to the point where escrow instructions were to be signed, respondent would be notified; that respondent would go to the bank where the escrow was to be held with the other parties and that proper instructions would be worked out for the payment of a commission to which respondent was entitled from Mr. Call and from appellant. Respondent agreed not to talk to Mr. Call regarding the deal on Beaconsfield and it is undisputed that he did not talk to Mr. Call.

In other words, appellant's agreement was that he would pay a commission in the event of an exchange with Mr. Call of "any" of appellant's properties. Obviously, this would include the Beaconsfield Manor apartments.

It is further contended by appellant that the portion of finding VII reading, "that plaintiff did not act as the agent for Asa V. Call or defendant or arrange any of the terms of the exchange of Beaconsfield Manor for the Call property, but acted as a mere middleman who brought said parties together in an attempt to effectuate an exchange of the Call property for property, other than Beaconsfield Manor, belonging to the defendant," is contrary to the undisputed evidence. We deem it unnecessary to here set forth the evidence which has been hereinbefore narrated in detail. Suffice it to say that even though it be conceded that respondent was a broker for Mr. Call and for appellant in trying to negotiate numerous exchanges which were not consummated, nevertheless such evidence does not invalidate a finding that respondent was not the agent for either party in the strict legal sense of that term, because there was no evidence to the effect that respondent was invested with any power to bind or commit either party or that he was to do anything with regard to negotiating the terms of the exchange other than to bring the parties together.

Appellant fails to recognize the distinction between a broker acting as an agent and a broker acting as a middleman. This distinction is set forth with clarity in *Clark* v. *Allen, supra,* at page 278, where the court declares that a broker acts as an agent when there is confided to him the power to act on behalf of the parties and to exercise discretion, skill and judgment; whereas a middleman possesses none of these prerogatives, and earns his commission simply by bringing the parties together. In the case just cited the court said:

"For a defense to the action it is claimed that plaintiff's assignors, the brokers, received compensation for their services from the other party to the trade without his (defendant's) knowledge, and for that reason he now insists that the brokers are barred from recovering any compensation from him. In other words, it is claimed that the law will not allow the brokers to act as the agent of both parties, and a contract of that kind for compensation will not be recognized by the courts. As a general principle, this contention is sound, but there are circumstances where a party may act for two persons and charge compensation from both for his services. If the duty of the broker is simply to bring together two men who desire to exchange their lands, and the broker's entire duty is performed when he has brought the two men together, then we see nothing against good morals and a sound public policy in allowing compensation to the broker from each of the parties. In such a case, the broker is in no sense representing conflicting interests. He has nothing whatever to do with the trade. Under the contract his advice and assistance to either party is not called for. Upon the state of facts here assumed, *the broker may be termed a middleman and not an agent in the strict sense of the term.*" (Italics added.)

The next point urged by appellant is that the court erred in finding that defendant was indebted to plaintiff in the sum of $3,582.05 and interest, because in arriving at said sum the court failed to allow defendant interest on the $30,000 value of the Call residence, or interest on money advanced by defendant in maintaining and operating said Call residence until it was sold, or compensation for the use of furniture in the Call residence, including reimbursement for expenses incurred in transportation of such furniture from Oregon to the Call residence. For an intelligent consideration of this point, it is necessary to remember that appellant's agreement with

respondent was that he would pay the latter "one-half of the net proceeds of the sale of the Call house above $30,000." The court found that the gross sales price of the Call property was $55,000. It was also found that certain items listed in Exhibit "A" attached to defendant's answer "were incurred and paid by defendant as reasonable expenses of maintaining and selling the Call property," totalling the sum of $15,985.90; that the net proceeds over $30,000 from the sale of the Call property, before commissions, was $55,000 less $30,000, less $15,-985.90, to wit, the sum of $9,014.10; that one-half of said amount is $4,507.05; "that defendant is entitled to credit for $500 heretofore paid by him to plaintiff on account of commissions and the sum of $425, as and being one-half of the commission paid plaintiff by Mr. Call; that one-half of the net proceeds of the sale of the Call property over $30,000, . . ." less the above mentioned expenses and credits amounted to $3,582.05, for which plaintiff was given judgment.

By its findings the court determined that defendant was not entitled to interest upon his investment of $30,000 in the Call property or interest upon the disbursements made by him as reasonable expenses of maintaining and selling the Call property. With reference to the agreement between the parties defendant testified that "in arriving at such net proceeds, I was to receive $30,000 plus the cost of maintenance and upkeep, including caretaker, gardener, taxes, reasonable interest to me on the $30,000, and any other expenses incurred, including any commission paid on the sale, and after such deduction the net proceeds should be divided equally between us"; while plaintiff testified as follows: "All of this conversation was in connection with the proposed trade of Mr. Call's house for the Cunningham apartments. This was the only time that Mr. Kinsey and I ever discussed the carrying charges that would be involved on Mr. Call's residence. There was no agreement or discussion at any time with respect to his being allowed to deduct any carrying charges over and above $30,000, or any other amount in connection with the exchange of Mr. Call's residence for the Beaconsfield apartments. . . ."

On rebuttal plaintiff testified: "There never was at any time any discussion between Mr. Kinsey and myself that he was to have any interest or any carrying charges in connection with any proposed exchange of any of his properties for the Call residence. There never was any discussion of Mr. Kinsey

▽

being entitled to the cost of maintenance and upkeep, including caretaker, gardener, taxes or any other item on the Call property. The only discussion that was had concerning these items was at the time that I first showed the Call property to Mr. Kinsey. We sat in my automobile in the front· of his house after I had taken him to see the Call property the first time in the fall of 1941. At that time I told him what the taxes were and we discussed what it would cost to maintain the house and grounds. That was several months before Mr. Kinsey acquired the Beaconsfield. It was understood that in the event that he made a deal on the Call house he would naturally have to take care of those expenses. . . . ''It was only after the escrow was signed up between Mr. Kinsey and Mr. Call behind my back, that any arrangement other than a 5% commission to me on both sides of the deal, was discussed. The terms of that deal were arranged orally within two or three days after the deal went into escrow in December, 1941. There was no discussion between Mr. Kinsey and myself prior to or at the time of giving the memo of December 23, 1941, except the discussion which I have heretofore related on the stand.''

The court found ''that there was no agreement or discussion between the plaintiff and defendant to the effect that interest was to be charged as a disbursement against the gross proceeds of the sale of the property on the sum of $30,000 set forth in the agreement of December 23, 1941, or on any of the disbursements shown in Exhibit A to defendant's answer, . . . That in the fall of 1941 and in connection with the proposed exchange of the Call property for property, other than Beaconsfield Manor, belonging to the defendant, plaintiff and defendant discussed the amount of taxes on the Call property, the expense of paying a gardener, and the amount of insurance, but that there was no discussion between plaintiff and defendant at any time concerning interest on $30,000 or interest on any moneys that might be disbursed by defendant as carrying charges on, or expenses in effecting the sale of, the Call property; . . .''

In view of the foregoing testimony given by plaintiff, it cannot be said that the findings just quoted are without evidentiary support. True, there was a conflict, but when a finding or judgment is attacked upon the ground of insufficiency of the evidence, the province of an appellate tribunal begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,

which will support the questioned finding of fact or judgment. (*Eggert* v. *Pacific States S. & L. Assn.*, 57 Cal.App.2d 239, 243 [135 P.2d 412, 136 P.2d 822]; *Viner* v. *Untrecht*, 26 Cal. 2d 261, 267 [158 P.2d 3]; *Cordell* v. *City of Los Angeles*, 67 Cal.App.2d 257, 265 [154 P.2d 31].)

Appellant insists, however, that the record shows that the court believed the defendant rather than the plaintiff, because by its finding numbered VII it determined that defendant was entitled to add the sum of $15,985.10 expended for the upkeep and maintenance of the Call property to the sum of $30,000 in computing the net proceeds, and because, as revealed by the statement on appeal, the court in giving "its decision from the bench" stated, "I find for the plaintiff upon the contract." That after disallowing certain items of deductions claimed by defendant, the court said: "However, I disagree with Mr. Hughes (one of plaintiff's counsel) and feel that Mr. Kinsey (the defendant) is entitled to reasonable interest, and I feel he is entitled to credit at the rate of 3% per annum, and the credit for interest, per schedule attached to the answer as Exhibit "A," to wit, $4319.25, is reduced to 3% per annum.

"QUESTION BY MR. HUGHES: You mean interest on $30,000 and the carrying charges?

"THE COURT: No, interest on $30,000, the value of the Call residence, from the time it was acquired until it was sold. No interest will be allowed on the carrying charges or other expenses paid by Mr. Kinsey.

"Mr. Hughes will prepare the findings and serve them."

It appears that thereafter counsel for plaintiff communicated with the trial judge, and on July 28, 1944, wrote a letter to defendant's counsel, a copy of which was transmitted to the trial judge. The letter follows:

"Re: Williams v. Kinsey

"Gentlemen:

"At the close of the trial of the above entitled action it was not clear to me from the remarks made by the court whether or not there was to be a finding that the contract had been modified by an oral agreement. I asked Judge Clarke about it, and upon being advised that there was to be no such finding, I asked, and received permission from the court, that I be allowed to prepare findings making no provision for the payment of interest. The court granted this request, stating

that I should write you a letter setting forth the facts and advising you that if you desired to raise any issue on that point, the same could be done by proposing counter findings and setting the same down for settlement.

"Accordingly, I have prepared and hand you herewith a copy of the findings prepared as per my suggestion above set forth.

"I have not cited to the court, but cite to you now the case of *Young* v. *Canfield,* 33 Cal.App. 343 [164 P. 1134], which is practically on all fours with the case at bar, which, in my judgment, makes it rather futile to spend any more time on the interest question."

The statement on appeal then continues:

"Thereafter plaintiff prepared and served proposed findings of fact and conclusions of law and judgment, in which findings and judgment interest was disallowed entirely. Objections to the failure of the court to make an allowance of interest in the findings were filed by defendant and settlement of the findings was set down for hearing."

At such hearing defendant's counsel called the attention of the court to the foregoing letter, and the trial judge stated that a copy thereof had been received by him through the mail. Following such hearing the court adopted the findings prepared by plaintiff and disallowed the aforementioned interest items. Thereafter defendant moved for a new trial, and during the hearing of such motion the statement on appeal reveals that the following occurred: ". . . The court stated during the course of the hearing thereof that at the close of the trial he had felt that as a matter of equity Mr. Kinsey was entitled to reasonable interest on $30,000, but that after hearing argument he felt that he was wrong and that Mr. Kinsey was not entitled to any interest, and thereupon denied the motion for a new trial."

What transpired in the instant case demonstrates the wisdom of the rule that the deliberations of courts are conclusively merged in their orders or judgments, and the oral or written opinions of trial judges may not be considered for the purpose of reversing such orders or judgments. (*De Cou* v. *Howell,* 190 Cal. 741, 751 [214 P. 444]; *Southern Cal. etc. Lines* v. *San Diego etc. Ry. Co.,* 66 Cal.App.2d 672, 676 [152 P.2d 470].) That the written or oral opinion of the trial court is no part of the record on appeal and will not be

considered by the appellate court for the purpose of predicating error upon the rulings of the trial court or in determining whether the findings of fact are supported by the evidence, is the general rule. (*Rickards* v. *Noonan*, 40 Cal.App.2d 266, 271 [104 P.2d 839].) ▮ It is settled that inconsistencies between the written or oral opinion of a trial judge or his antecedent expressions and the findings of fact cannot be considered by an appellate court. (*Lord* v. *Katz*, 54 Cal.App.2d 363, 366 [128 P.2d 907]; 20 Cal.Jur. § 80, p. 129; *Lynch* v. *International B. Corp.*, 68 Cal.App. 432 [229 P. 968]; *Gates* v. *Green*, 151 Cal. 65, 69 [90 P. 189].) ▮ We do not regard subdivision a of rule 5 of Rules on Appeal for the Supreme Court and District Courts of Appeal of this state, adopted by the Judicial Council and effective July 1, 1943, authorizing the inclusion of "any written opinion of the superior court" in the record on appeal, as in any way restricting by antecedent expressions of the trial court the absolute power of the trial judge to declare his final conclusions in the only manner authorized by law, to wit, by filing his "decision" (findings of fact and conclusions of law) as provided in section 632 of the Code of Civil Procedure. In the instant case the trial judge frankly stated that while at the conclusion of the trial he was of the opinion, as orally expressed, that "as a matter of equity Mr. Kinsey was entitled to reasonable interest on $30,000, but after hearing argument he felt that he was wrong and that Mr. Kinsey was not entitled to any interest."

The court having found, and their being substantial evidence to support the finding, that there was no conversation or agreement between appellant and respondent to the effect that appellant was to have reasonable interest, it now devolves upon us to determine whether, in the absence of any agreement between the parties for the payment of interest on the $30,000 and the carrying charges, the determination of the court not to award such interest is supported by law. ▮ The rule seems well established that except in the case of a loan of money, which by our code is made subject to the payment of interest by presumption (Civ. Code, § 1914), the matter of payment of interest on the "net proceeds of the sale," as used in the agreement before us, must be made the subject of an express agreement; otherwise it cannot be charged. (*Young* v. *Canfield*, 33 Cal.App. 343, 344 [164 P.

1134]; *Howard* v. *D. W. Hobson Co.*, 38 Cal.App 445 [176 P. 715].) Where, as here, appellant advanced his capital' and respondent his skill, the former was not entitled to interest on his contribution of capital to the venture in the absence of an agreement entitling him to make such charge. (*Clement* v. *Duncan*, 191 Cal. 209, 221 [215 P. 1025].) In the state of the record here presented, the finding of the court disallowing interest on the $30,000 and carrying charges was supported both by the evidence and the law.

■ With reference to the refusal of the court to allow credit to the defendant for use of the furniture moved into the Call house, reimbursement for the expense of its transportation from Oregon in the sum of $874.93, and allowance of interest thereon, the court found that appellant moved said furniture from a house he had purchased in the State of Oregon and that such furniture was "temporarily placed in the Call property and was not sold with said property; that said expenses were not reasonably incurred in maintaining, or effecting the sale of, the Call property, but were made for defendant's benefit." There was substantial evidence in the record justifying this finding and it cannot therefore be disturbed. The very fact that the furniture was not sold with the Call residence lends strength to the court's conclusion that its presence in the house was not for the purpose of inducing a sale of the premises, but as the court found, was for defendant's convenience and benefit.

■ As a further ground of appeal, it is contended by appellant that the agreement of December 23, 1941, raised only a rebuttable presumption of consideration and that such presumption was overcome by the evidence and the finding that the exchange of the Call residence for the Beaconsfield apartments was effected without any assistance or participation on the part of plaintiff. This claim is unavailing, because the agreement of December 23, 1941, was a different agreement from the one originally made. This is shown by the very language of the written document, which recites: "It is understood that *in lieu* of paying you a commission on the Call, Beaconsfield trade, I will pay you. . . ." Appellant was under a moral obligation to pay respondent a commission for bringing appellant and Mr. Call together. This in itself was sufficient legal consideration for the subsequent written agreement of December 23, 1941. (Civ. Code, §§ 1605, 1606; opinion by Supreme Court denying a hearing in *Medberry*

v. *Olcovich,* 15 Cal.App.2d 263, 271 [59 P.2d 551, 60 P.2d 281].) Furthermore, the issue of lack of consideration was raised for the first time on appeal. The answer does not plead lack of consideration. It was not urged in support of the motion for nonsuit or on motion for a new trial. Lack of consideration of a written instrument is an affirmative defense and must be pleaded. (*Bryan* v. *Banks,* 98 Cal.App. 748, 755 [277 P. 1075] ; *Rivera* v. *Cappa,* 29 Cal.App. 496 [156 P. 1016, 1017] ; *California S. F. Corp.* v. *J. D. Millar R. Co.,* 118 Cal.App. 185, 189, 190, 191 [5 P.2d 41] ; *Fierce* v. *Reed,* 106 Cal.App. 673, 677 [289 P. 855] ; 6 Cal.Jur. § 138, p. 209.)

 Appellant next asserts that respondent cannot recover on the second count of his complaint on the theory of quantum meruit. However, plaintiff has not attempted to state a cause of action on the theory of quantum meruit. The second cause of action is a common count for money had and received. It alleges that there came into the possession of defendant certain money for and on account of plaintiff for the latter's use and benefit and which belonged to him. This common count may properly be joined in the same complaint with other common counts or with a cause of action on an express contract. (17 Cal.Jur. § 27, p. 633.)

Finally, appellant contends that the court erred in computing the amount found due as set forth in finding V, but in his reply brief concedes that ''while the court's Finding V is somewhat confusing, the computation upon the theory adopted in respect to respondent's right to recover is apparently correct.''

For the foregoing reasons, the judgment is affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 18, 1946. Edmonds, J., voted for a hearing.